UNITED STATES of America, Appellee,

v.

William Clinton ROARK, Appellant.

No. 90–1334WM.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1990.
Decided Jan. 30, 1991.

Irl B. Baris, St. Louis, Mo., for appellant.

Michael A. Jones, Springfield, Mo., for appellee.

Before ARNOLD and BEAM, Circuit Judges, and BOGUE,* Senior District Judge.

BOGUE, Senior District Judge.

William Clinton Roark was convicted of the following in violation of 21 U.S.C. §§ 841(a)(1) and 846: (1) Conspiracy to manufacture and possession with intent to distribute methamphetamine and phenyl–2–propanone, commonly known as "P2P" (§ 846); (2) manufacture of P2P (§ 841(a)(1)); and attempt to manufacture methamphetamine (§§ 846 and 841(a)(1)). Appellant raises three issues on appeal. First, that Appellant was not properly indicted and tried because Methamphetamine and Phenyl–2–Propanone [P2P] are and were not lawfully proscribed under Schedule II of the Federal Controlled Substances Act. (This issue was not raised in the district court). Second, that the court erred in refusing to instruct the jury as to multiple conspiracies. Finally, that the court erred in refusing to declare a mistrial after rescinding its order to produce material under the Jencks Act.

I. BACKGROUND:

Appellant's indictment resulted from the discovery on May 22, 1987, of an extensive, operating clandestine drug lab on rural property in Missouri. The drug operation, which had been operating since March of 1985, involved several co-defendants, all of whom belonged to the Hells Angels Motorcycle Club. Four of the co-defendants were arrested in June of 1986, and Appellant, who remained a fugitive for two

* The Hon. Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

**1428** 

years, was not arrested until May 20, 1989, after a car-motorcycle chase in California.

Ultimately, Appellant was tried and convicted, and sentenced to concurrent terms of 20 years imprisonment on each count, a three year special parole term on Count II, and $150 mandatory penalty. (Sentencing was not under the Sentencing Reform Act of 1984). Other defendants charged in the superseding indictment were either tried or pleaded guilty prior to Appellant's trial.

### A.

The issue of the reclassification of methamphetamine was not raised in district court and is not open for normal review. *United States v. Bear Runner*, 502 F.2d 908, 910 (8th Cir.1970). This is the kind of point that is so fundamental, however, that it would be open for plain-error review on appeal. Therefore, we will address it on its merits.

Appellant urges that methamphetamine is not a controlled substance and, therefore, should be excluded from the controlled substance schedule because under the Food and Drug Act, it may be sold over the counter without a prescription. *See* 21 U.S.C. § 811(g)(1). To support this conclusion, Appellant argues that both Rynal and Vicks Inhaler nose sprays contain isomers of methamphetamine.[1]

In other words, Appellant concludes that because Vicks Inhaler contains a diluted isomer of methamphetamine and is sold over-the-counter, the Drug Enforcement Administration (DEA) or Bureau of Narcotics and Dangerous Drugs (BNDD) cannot classify Methamphetamine as a controlled

substance. This analysis is erroneous. Section 811(g)(1) requires exclusion of any substance from the schedules of controlled substances if it can be lawfully sold over the counter without a prescription:

> (g)(1) The Attorney General shall by regulation exclude any non-narcotic substance from a schedule if such substance may, under the Federal Food, Drug, and Cosmetic Act, be lawfully sold over the counter without a prescription.

 The FDA has not approved methamphetamine for sale over-the-counter, but rather has approved a combination of ingredients found in inhalers containing a diluted isomer of methamphetamine.[2] Obviously, such a combination of ingredients does not create the potential for abuse and harm that the controlled forms of methamphetamine present. We therefore reject Appellant's contentions, and conclude that methamphetamine is properly classified as a Schedule II controlled substance pursuant to 21 C.F.R. 1308.12(d). *See United States v. Kendall*, 887 F.2d 240 (9th Cir. 1989); *United States v. Schrock*, 855 F.2d 327 (6th Cir.1988).

 The issue as to whether the Attorney General, the BNDD or the Drug Enforcement Administration (DEA) followed the correct procedures and made the findings necessary to reschedule methamphetamine has been presented to and ruled upon by the Ninth Circuit Court of Appeals. *See Kendall*, supra. We believe the findings and conclusions in that case relative to rescheduling of methamphetamine fully apply to that issue in the present case.

---

**1.** Both Rynal and Vicks Inhaler nose sprays were legally sold over the counter pursuant to 21 C.F.R. 1308.22, the Federal Regulation which implements 21 U.S.C. § 811(g)(1). Currently, only Vicks Inhaler is legally sold over the counter. Rynal has been removed from the list of non-narcotic over-the-counter drugs.

**2.** The exclusion, under 21 C.F.R. 1308.22, of the Vicks Inhaler from the Schedule is distinct from an *exclusion of methamphetamine itself from* Schedule II. Under 21 C.F.R. 1308.12(d), methamphetamine or its isomers, in "any material ... or [in] any quantity," is a controlled substance under Schedule II *unless specially excepted.* The FDA has not approved methamphet-

amine, its salts, isomers, or salts of its isomers for over-the-counter sales. The FDA has, however, approved the combination of ingredients that appears in the Vicks Inhaler (or other approved nose sprays). The exclusion of the Vicks Inhaler, therefore, is a "specific exception." Other uses of methamphetamine or its isomers, unless specifically excepted, remain controlled substances under Schedule II. By authorizing the FDA to approve such over-the-counter medication, Congress neither expressly nor impliedly limited the ability of the Attorney General to classify methamphetamine as a controlled substance.

On May 26, 1971, the director of the Bureau of Narcotics and Dangerous Drugs (BNDD) published a notice in the *Federal Register* of the proposed transfer of amphetamine and methamphetamine, their salts, optical isomers, and salts of their optical isomers from Schedule III to Schedule II. (36 Fed.Reg. 9653 (1971)) Addendum, pp. 1–2.) The director further stated that the proposed transfer was based upon the investigation of his agency "... and upon the scientific and medical evaluation and recommendation of the Secretary of Health, Education and Welfare, received pursuant to Sec. 210(b) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 811(b))."

The director then enumerated his findings as required by § 812(b)(2): that methamphetamine has a high potential for abuse; that it has a currently accepted medical use, *with severe restrictions;* and, that the abuse of this substance might lead to severe psychological dependence.

The statute further provides that the Attorney General, after proceedings required by 21 U.S.C. §§ 811(a) and 812(b), may add substances to Section 812 schedules or transfer substances between these schedules. 21 U.S.C. § 811(b). Under the authority of Section 871(a) and 28 U.S.C. § 510, the Attorney General properly delegated this authority to the Director of the Bureau of Narcotics and Dangerous Drugs (BNDD). 28 C.F.R. 0.100 (1971). In 1971, BNDD followed the procedures and made the findings required to reschedule methamphetamine. Accordingly, an order was made by the director and published on July 7, 1971, in the *Federal Register* transferring methamphetamine from Schedule III to Schedule II, 36 Fed.Reg. 12734 (1971) Addendum, pp. 3–5.

Notwithstanding the conclusion by Appellant Roark that the procedures mandated by Congress to precede rescheduling were ignored, we conclude otherwise and further conclude that methamphetamine was and is a Schedule II controlled substance as alleged in the indictment.

### B.

■ Appellant's second contention—that the jury should have been instructed on multiple conspiracies—is also without merit. The essence of a conspiracy is an agreement to commit an illegal act. *United States v. Boone,* 641 F.2d 609, 611 (8th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981); *United States v. Cohen,* 583 F.2d 1030, 1039 (8th Cir. 1978). The problem is to determine whether one overall agreement binds all of the participants or whether distinct groups of individuals are engaged in "separate adventures of like character." *See Kotteakos v. United States,* 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946); *United States v. Jackson,* 696 F.2d 578, 582–583 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). Multiple groups and the performance of separate crimes or acts do not rule out the possibility that one overall conspiracy exists. *See United States v. Semek,* 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). *See United States v. Alvarez,* 755 F.2d at 848.[3] A variance occurs only when a single conspiracy is alleged, but multiple conspiracies are proven.

■ Thus, we will reverse Appellant's conviction only if the failure of the trial court to give a multiple conspiracy instruction results in substantial prejudice to Appellant. *See Kotteakos,* 328 U.S. at 752, 66 S.Ct. at 1241–42, n. 3. Viewing the evidence in the light most favorable to the verdict,[4] we are convinced that a jury could not reasonably infer that Appellant was involved in more than one conspiracy. Although various defendants entered the alleged conspiracy at different times and per-

---

**3.** In *Alvarez,* this issue was presented conversely. The trial court determined that murder was a natural outgrowth of a drug conspiracy and therefore a *Pinkerton* instruction was not improper. The scope of review by this court, however, is just as limited.

**4.** *E.g., United States v. Jackson,* 696 F.2d 578, 582, n. 1 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983).

formed different functions, there was sufficient evidence for the trial court to have determined that if there was a conspiracy of any kind among the various defendants, including the Appellant, it was a conspiracy that had one criminal objective: to sell large quantities of methamphetamine or other drugs. We agree with the trial court that insufficient evidence existed in the record to support an alternative instruction on multiple conspiracies.

### C.

Appellant was a member of the Hells Angels Motorcycle Club. Unfortunately, during voir dire and opening statement the Hells Angels organization—and its general reputation for drug-related activities—was injected into the trial over defense counsel's objection. The Assistant U.S. Attorney in his opening statement referred to "the Hells Angels group out of California—to manufacture not in California but here in southwest Missouri in the hills of the Ozarks, in a remote setting, drugs."

The government's first witness, DEA Agent Sparks, testified generally about the Hells Angels and their activities. The next day, the government called DEA Agent Heald, who had no involvement in this case or with Appellant, to testify as an expert on the Hells Angels organization. He explained the organization of the group and its numerous chapters, including the Richmond Club to which Appellant belonged. Heald claimed he had sources of information about the Richmond Club and received information almost on a daily basis. Further, he testified he had been in at least 100 methamphetamine labs and had written reports about the Hells Angels' illegal drug activities, including operation of these labs. Appellant then requested production of the reports pursuant to the Jencks Act,[5] (*see* 18 U.S.C. § 3500), which request was initially denied.

Next, the government put Anthony Tait on the stand. Tait acted as a paid undercover agent for the government, while purporting to be a Hells Angel. He reiterated the testimony of Agent Heald, and further stated that individual chapters dealt in narcotics, primarily methamphetamine and cocaine. He identified the Appellant. On July 16, 1986, he recorded a meeting in San Francisco and also testified that the Hells Angels sought to set up drug labs in rural areas.

On cross-examination, Tait testified that he made "hundreds of tapes." Agent Baltas also testified that there were 200 to 300 tapes in relation to Tait's activities associated with Hells Angels, including some relating to the Richmond Club. This testimony

---

5. The pertinent parts of 18 U.S.C. § 3500 (Jencks Act) applicable to this case are as follows:

 (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

 (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

 (c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. * * * Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

 (d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared. * * *

triggered a request by Appellant's counsel to "produce any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." [6]

Ultimately, the trial court directed the government to produce all reports generated by Heald which related to any Hells Angels Motorcycle Club. Also to be produced, either for Appellant or for the court's *in camera* review, were Agent Heald's reports regarding Tait's involvement in the investigation; any agent's reports which mention Tait; and any tapes generated by Tait.

The district court then stated that the materials need not be produced if an ongoing investigation might be jeopardized or if the material was so voluminous as to delay the trial. Shortly thereafter, the government argued both that the material was too voluminous and that it was not relevant.[7] The trial judge reversed his earlier decision and released the government from the obligation of producing the material.

■ At no time did the trial judge state that the tapes and records were not Jencks Act material. Neither did the judge indicate that he had examined *all* such tapes and documents in making his earlier decision that they were, in fact, Jencks Act items. The only argument offered by the trial court for denying Appellant access to the requested material was the volume of the tapes and documents. The Jencks Act, however, does not restrict production of potentially relevant materials simply because the materials are, or might be, voluminous.

■ The Seventh Circuit addressed substantially the same issue and concluded that the trial court must assume responsibility for determining the relevancy [8] of the requested materials:

> The procedures mandated by the Jencks Act do take time. But they do not burden the business of the overworked district courts because they *are* the business of the district courts. The Jencks Act merely spells out in detail the business district courts have always been in: the business of reviewing the relevance of the evidence that determines guilt or innocence.

*United States v. Allen*, 798 F.2d 985, 1000 (7th Cir.1986).

Once the government challenges the relevancy of the requested material, the trial judge has an affirmative statutory duty to inspect the potential Jencks Act materials *in camera*. Obviously, whether a document is a "statement" under the Jencks Act is a question for the trial court, not for the government. *See United States v. Wables*, 731 F.2d 440 (7th Cir.1984). The trial judge should not make a final disposition upon the representation of government counsel. *United States v. Keig*, 320 F.2d

**6.** The Jencks Act provides a three-part definition of the term "statement": (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

**7.** The government began its search and ultimately advised the court that there were 200 to 300 tapes, primarily in Anchorage and San Francisco, 12 Volumes in the Anchorage informant file, and 26 Anchorage volumes, one of which had 8 sub-files, on information from Tait activities. San Francisco had approximately the same. There were 11 files in Kentucky plus a number of documents. They found a record of

one tape in San Francisco, dated September 27, 1986, in which Appellant was involved in the conversation. (This was after both sides had rested.) Some of the 200 to 300 tapes had been transcribed, others not. Some files had been made available for *in camera* inspection by a Kentucky judge. It was estimated that the 200 to 300 tapes ran 500 hours of time.

**8.** If the information defense counsel seeks to have produced exists, and is a statement as defined by the Jencks statute, then a determination of its relevancy must be made before it may be produced. There is no question the statute mandates that if the federal prosecutor claims the statements do not "relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera." 18 U.S.C. § 3500(c); *United States v. Wables*, 731 F.2d 440, 445 (7th Cir.1984).

634 (7th Cir.1963). If there is any reasonable conflicting evidence, then an *in camera* inquiry must take place. *Allen,* 798 F.2d at 996.

Under certain circumstances, when the government refuses to produce the requested material, the trial judge may strike the testimony of the witnesses and instruct the jury accordingly. The judge below instructed the jury as follows, regarding the testimony of Heald and Tait:

> At the beginning of the trial, I told you that if I struck certain testimony from the record, or told you to disregard it, such testimony is not evidence and must not be considered by you.
>
> The entire testimony of Special Agent Michael Heald of the Drug Enforcement Administration concerning the activities and organization of the Hells Angels Motorcycle Club is stricken. Thus, such testimony is no longer before you and may not be considered by you for any reason.
>
> Likewise, the entire testimony of Hells Angels former member Anthony Tait is stricken, . . . .
>
> \* \* \* \* \* \*

In other words, proof of defendant's membership in the Hells Angels Motorcycle Club in no way proves that defendant is guilty of the crimes with which he is charged.

In most cases, the appellate court should not second-guess evidentiary decisions of the trial judge, decisions which so often are made in the flux and flurry of a fast-paced trial. In this case, however, the trial judge allowed government counsel ultimately to determine the relevancy of the potential Jencks Act material. Instructing the jury to disregard the testimony which created the demand for the material simply was inadequate to cure the damage already done to Appellant.

Such an approach is improper and contrary to the mandates of the statute. Therefore, the government's failure to produce the potential Jencks Act material—ei-

ther to Appellant or to the trial judge for *in camera* inspection—constitutes reversible error.

## D.

That disclosure of this material might impact ongoing drug investigations has no merit. Little evidence was presented which would indicate that the government's involvement in other cases would necessarily be jeopardized by disclosure of potential Jencks Act material in this case.

## E.

█ Finally, regarding the trial court's attempt to cure the infection caused by the admission of evidence concerning the Hells Angels organization, we agree with Appellant. The government began its assault on the Hells Angels organization in voir dire, and continued throughout the trial in a relentless attempt to convict Appellant through his association with the motorcycle club.[9]

Of great interest and weight to this court are the critical—and well reasoned—comments of the trial court relative to the testimony of Heald and Tait about the Hells Angels organization. In effect, the trial judge made a perfect case for ordering a new trial.

> Well, maybe I shouldn't make this statement. But those two witnesses were not necessary for the government to prove a case, and you've just opened up a Pandora's box by calling those two witnesses.
>
> \* \* \* \* \* \*
>
> Well, of course, it's absolutely useless to strike the testimony of Heald or Tait and tell the jury to disregard it because they're not going to.
>
> The bell has been rung in that regard, and you can't unring it.
>
> \* \* \* \* \* \*

**9.** The government attacked the Hells Angels in opening statement, through the direct testimony of Heald and Tait, and in final argument, following the admonition by the trial judge to the jury to disregard Appellant's association with the Hells Angels.

As I said, this has opened up a real Pandora's box, and it need not have been necessary to do so.

\*　　\*　　\*　　\*　　\*　　\*

Now, you've elected to try, at least partially the Hells Angels Motorcycle Club, which was not necessary in this case. And I don't want to have to retry this case, and I don't want it to go to the Court of Appeals and let them spend time on it and send it back to me to retry it.

And that's the tactic that you used in trying the case, and you're going to have to live with it.

The thing about it, Mr. Jones, it was not necessary—I've said this and there's no point in my repeating it—it was not necessary to try the Hells Angeles Motorcycle Club—

\*　　\*　　\*　　\*　　\*　　\*

The testimony of Mr. Tait and Mr. Heald was very damaging testimony; but, frankly, it did not go really to the guilt or innocence really of the defendant in this lawsuit. It went to the general reputation—I will put it that way—of the Hells Angels Motorcycle Club.

And you had all sorts of evidence concerning the association of the co-defendants in this case, and the fact that they were all members of the club, all but Bredel, that could have come out without any problem.

But when you start getting into evidence that all members are involved in criminal activity and that they deal in methamphetamine and cocaine distribution and manufacture, that sort of thing is extremely damaging and was not needed in this lawsuit.

\*　　\*　　\*　　\*　　\*　　\*

Now, I made a statement the other day that the testimony of Mr. Tait and Heald were very prejudicial, and it was. I'm wanting to kick myself for letting it come in because certainly I could have kept it out under Rule 403.

\*　　\*　　\*　　\*　　\*　　\*

There's no point in crying over spilled milk. Accept the bell has been rung, and we can't unring it. I'm the one that let it in.

And I think under Rule 406, it's admissible. What I'm kicking myself about is, under Rule 403 I could have refused it, and by applying hindsight it's obvious that that's what I should have done because the time being consumed by it far outweighs any probative value that it has. And that would satisfy Rule 403, or that the prejudice far outweighed the probative value; either one, and wanted to apply would have been applicable.

Well, of course, I don't have the luxury that appellate judges have. Trial judges have to pass on matters on the spur of the moment, which I did pretty much in ordering this material be made available. Maybe—

\*　　\*　　\*　　\*　　\*　　\*

We've got a jury that's heard roughly four days of evidence, and the situation is just so uncertain that I really—I would prefer the risk of having to retry the case rather than the risk of wondering just how long it's going to be before we get all that material that would satisfy you, and then the claim will be made that everything wasn't furnished and everything wasn't reviewed and—

I just think it's better judgment concerning court time, lawyer time, jury time, witness time if I was to go the route of striking that testimony from the record and telling the jury to disregard it.

It certainly simplifies this case. It leaves a very specific issue there as to whether the striking of it got rid of any prejudice.

Of course, the jury was instructed at the conclusion of the trial to disregard the damning testimony of Heald and Tait. As the trial court admitted, however, a bell once rung is difficult to unring. Justice Brennan, opined on our human limitation to disregard that which we have heard:

We agree that there are many circumstances in which this reliance is justified. Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoid-

able through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.... It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in *Jackson v. Denno*, supra [378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)], there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476.

One statement, damaging but isolated, is easily remedied through a limiting instruction. The government cannot, however, in its case-in-chief, introduce evidence of Appellant's unsavory character merely to show that he is a bad person and thus more likely to have committed the crime.[10] In this case, the jury could not disregard the entire theme of the trial: guilty by association.

Evidence of uncharged misconduct to show criminal propensity is inadmissible not because it is logically irrelevant, but because it is inherently and unfairly prejudicial. It deflects the jury's attention from the immediate charges and causes it to prejudge a person with a disreputable past, thereby denying that person a fair opportunity to defend against the offense that is charged. *Michelson v. United States*, 335 U.S. 469, 476, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948); 2 Weinstein's Evidence, § 404[04]–28 (1986). Therefore, the government's attempt to tie Appellant's guilt directly to his association with the Hells Angels Motorcycle Club constitutes reversible error.

### F.

We do not regard lightly the discretion granted to the trial judge under the Jencks Act, or in matters relating to the admissibility of evidence during the course of a trial. There is a fundamental soundness in giving such discretion to the trial judge. In this case, however, had the Jencks Act not been implicated, the trial judge still faced the issue of the government improperly injecting the Hells Angels Motorcycle Club into the case, virtually as an uncharged defendant. In either event, with or without the Jencks Act question, the government ignored the correct instruction given by the court and continued to harangue the jury about the alleged institutional criminality of the Hells Angels Club. We find these actions on the part of the government to be reversible error.

### G.

For all the reasons enumerated above, the decision of the district court is reversed and this case is remanded for a new trial.

---

**10.** Despite the judge's admonition to the jury in closing instructions, the prosecutor nevertheless argued in his summation:

 He's guilty just as much as this book screams out the truth about what was going to be done there, about putting methamphetamine throughout the United States; and came out here to Missouri to do it. This Hells Angels chapter comes out here, and they think that we're so stupid here that we can't figure it out; we can't find it; and then through their buffers, through their use of other people, they can convince you that the moon is made of green cheese and to forget all the testimony that you've heard.

 Ladies and gentlemen, don't let this evidence slip away. Justice will never get another chance.