# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3016

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Darnell A. Gray, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 12, 2004
Filed: June 1, 2004

_____

Before LOKEN, Chief Judge, BOWMAN, and WOLLMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury convicted Darnell Gray of aiding and abetting possession of more than five kilograms of cocaine with the intent to distribute the substance. Gray appeals, challenging the sufficiency of the evidence against him, as well as the district court's[1] denial of his motions to suppress and for mistrial. We affirm.

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

## I.

On the morning of March 27, 2002, Arkansas State Trooper Kyle Drown stopped the 1975 Chevrolet Camaro occupied by Gray and driven by his co-defendant, Denise Lawrence, after observing the Camaro follow a truck too closely and weave in its lane. During the course of issuing a warning citation, Drown became suspicious that something was amiss. Lawrence appeared to be very nervous, the pair had been driving non-stop from California, and their stories regarding the trip struck Drown as inconsistent.[2] In addition, Gray stated that he had never been arrested, but a routine background check disclosed a charge for carrying a concealed weapon.

Drown issued the warning citation and then secured permission to search the vehicle from both occupants. While conducting the search, Drown observed what he thought was an abnormal amount of luggage for a seven-day trip. In addition, he noticed loose rivets in the rear of the vehicle and some carpeting that had been spot-glued down. These observations aroused Drown's suspicions further, but he was unable to locate any contraband. Drown then resorted to his drug detection dog, Rudy, who alerted to the odor of narcotics at the forward area of the Camaro. A further search revealed 17. 5 pounds of cocaine hidden in the Camaro's firewall.

---

[2]Lawrence first told Drown that she and Gray were engaged to be married, but then suggested the two were "working on" the matter. She indicated that she and Gray were headed to Nashville, Tennessee, to visit Gray's grandmother and to celebrate Gray's graduation, but she could not recall exactly where Gray had graduated from and could not identify what Gray did for a living. According to Trooper Drown, Lawrence first said that Gray owned his own business, but later suggested he was not currently working. Gray stated he was traveling to see a sick grandmother, but could not provide her phone number.

## II.

Gray first challenges the denial of his motion to suppress evidence. He does not dispute that he voluntarily consented to a search, but argues that he later withdrew that permission. We review the district court's legal conclusions on this point de novo, but evaluate its underlying factual determinations only for clear error. United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003).

After obtaining consent at approximately 11:09 a.m., Drown searched the vehicle and its contents for some 20 minutes without incident. Shortly after 11:30 a.m., Gray and Lawrence began expressing concern about the length of the search. Gray testified that he stated "[t]his is ridiculous" and asked how long the search was going to take. He admitted, however, that he did not ask to leave during this initial conversation, and it is undisputed that Drown continued looking through the vehicle.

A few minutes later, at approximately 11:33 a.m., Drown received a phone call, following which Gray and Drown had a second conversation, the content of which they recall differently. Drown testified that Gray merely asked that the search be speeded up and did not withdraw consent, whereas Gray testified that he attempted to withdraw consent by again indicating that the length of the search was "ridiculous" and twice saying that he and Lawrence were "ready to go now." Depending on whose testimony is credited, Drown responded to this second conversation by either asking or telling Gray about using the canine.[3] In any event, Drown moved the luggage that was outside the vehicle away from the vehicle's exterior and then conducted the canine search.

---

[3]The district court found that Trooper Drown responded by saying: "Well, I'm going to use the dog and then you can leave or not depending on what the dog does."

Withdrawal of consent need not be effectuated through particular "magic words," but an intent to withdraw consent must be made by unequivocal act or statement. United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001). The district court found that Gray and Lawrence made "protests to leave," but concluded that "there was no specific request to leave, and under the circumstances, . . . Trooper Drown was reasonable in continuing the search beyond the initial contact at 11:30." The district court further found that when the defendants became "more strident about their desire to leave," Trooper Drown decided to use Rudy, and only about nine or ten minutes elapsed between the time Gray first began objecting and the time Rudy alerted.

The district court's finding that Gray did not make a specific request to leave is not clearly erroneous. At most, Gray's first conversation with Drown amounted to an expression of impatience, which is not sufficient to terminate consent. Id. Furthermore, even if we assume that Gray's later statements were enough to withdraw consent (which the district court did not find), the district court did not clearly err in finding that Trooper Drown responded by using Rudy. The brief period it took to move luggage away from the vehicle and conduct an exterior canine sniff, between two and four minutes, did not require the occupants' consent and was constitutionally acceptable because it was supported by reasonable suspicion that criminal activity was afoot. United States v. Linkous, 285 F.3d 716, 720-21 (8th Cir. 2002). Finally, as the district court properly determined, Rudy's alert to the odor of narcotics furnished probable cause to return to the vehicle and search it further. Cf. Ross, 263 F.3d at 846; United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) (en banc).

Gray next challenges denial of his motions for a mistrial, a matter we review for abuse of discretion. United States v. Johnston, 353 F.3d 617, 622 (8th Cir. 2003), cert. denied, No. 03-9880, 2004 WL 875145 (May 24, 2004). During opening statement, the prosecution stated that two cellular telephones found in the Camaro placed calls to one Gregory Wyatt. The prosecutor then informed the jury that they

would "hear testimony that Gregory Wyatt is an individual from Los Angeles, California, who has a prior conviction for drug trafficking, cocaine, and has been the subject of at least six separate DEA investigations." Although the government then solicited testimony about Wyatt and Gray's contact with Wyatt, it did not follow through on its opening statement by introducing evidence regarding Wyatt's criminal history or the DEA's investigation of his activities. Nevertheless, Gray argues the statement, combined with the admission of evidence about Wyatt, mandated a mistrial given our decision in United States v. Roark, 924 F.2d 1426 (8th Cir. 1991). We disagree.

In Roark, the jury was informed that the defendant was a member of the Hell's Angel's motorcycle gang and then heard substantial, damaging testimony about the gang's illicit activities. As the trial court observed, the testimony was largely an indictment of the motorcycle gang and "did not go really to the guilt or innocence" of the defendant. Id. at 1433 (internal quotation marks omitted). We concluded that the entire theme of the trial was "guilty by association" and ordered a new trial due to the prosecution's "relentless attempt to convict [the defendant] through his association with the motorcycle club." Id. at 1432, 1434. This case is different.

First, we do not believe that the prosecutor's remark in opening statement was as ultimately incriminatory as the statement in Roark. The court's instructions twice informed the jury that statements by lawyers are not evidence, and the prosecution avoided further references to Wyatt's drug conviction and investigation by the DEA. Cf. United States v. Benitez-Meraz, 161 F.3d 1163, 1166 (8th Cir. 1998). Second, unlike Roark, the prosecution did not use its case-in-chief to elicit evidence that Gray was guilty by virtue of his membership in a gang of generally unsavory characters. Instead, the Camaro's registered owner, Anthony Flake, testified that Wyatt had offered him $5,000 to drive the Camaro to Texas, which he did, using instructions placed in his mailbox by an unknown person. During the trip, Flake made three collect calls to Wyatt to let Wyatt know he was okay. Wyatt then asked Flake to

make another trip, but Flake was unable to do so. Shortly thereafter, and despite having his own vehicle, Gray set off on a non-stop, cross-country trip in the same Camaro to visit a fictional grandmother in Tennessee, carrying a substantial quantity of cocaine. Near that time, calls were made from two cellular telephones in the vehicle to numbers associated with Wyatt, and Gray agreed that if the calls were made, he had made them. This evidence, albeit circumstantial, tends to show that Gray's explanation of his trek was bogus and is probative of both Gray's potential motive for taking the trip and his knowledge of the Camaro's contents. Accordingly, the district court did not abuse its discretion in admitting this evidence or in denying Gray's motions for a mistrial.

Gray's final challenge is to the sufficiency of the evidence regarding his knowing possession of the cocaine. We view the evidence in the light most favorable to the verdict and we will overturn the verdict only if no reasonable jury could have found Gray guilty beyond a reasonable doubt. United States v. Lee, 356 F.3d 831, 836 (8th Cir. 2003). Having so reviewed the evidence, we conclude that it was sufficient, and thus we will not disturb the jury's determination.

The judgment is affirmed.

_____