# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3477

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Gary McMullin, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: April 15, 2009
Filed: August 17, 2009

_____

Before MURPHY, BRIGHT, and BYE, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Defendant-appellant Gary McMullin appeals his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), challenging the district court's denial of his motion to suppress firearms evidence discovered during a United States Marshal's second entry into McMullin's house. McMullin asserts that the marshal lacked legal authority to re-enter his house, while the government contends that McMullin never withdrew the consent he granted for the initial entry. Having jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the district court and remand for further proceedings.

## I. Factual Background

United States Marshals Sean Newlin and Dave Davis had received an assignment to locate Daryl Crowder, for whom the state of Illinois had issued several arrest warrants in 2006. During the assignment, Marshal Newlin learned that Crowder had placed telephone calls from a residence in Missouri. After checking the address, Marshal Newlin discovered that another sex offender and felon, McMullin, resided there.

On October 10, 2007, Marshals Newlin and Davis drove to McMullin's residence in an attempt to locate Crowder. The marshals did not have a search warrant for the house. They arrived early in the morning in an unmarked vehicle but wore jackets marked "U.S. Marshal." As the marshals drove up the driveway to the residence, Marshal Newlin observed a person looking out of the front window of the house.

After stopping the vehicle, Marshal Davis walked around to the back of McMullin's house, while Marshal Newlin headed toward the front of the house. Around this time, Marshal Newlin heard a person yell from within the house, "The U.S. Marshals are here." Marshal Newlin climbed the steps to the front door, which McMullin opened. Marshal Newlin recognized him from a photo on the sex offender registry website.

Marshal Newlin and McMullin exchanged greetings. Marshal Newlin asked if anybody else was in the house. McMullin replied, "You know, I'm just having coffee with my uncle." Marshal Newlin asked, "May I come in and talk with you?" McMullin replied, "Yeah, sure, come on in. We're just having coffee." McMullin stepped back inside the house and started walking through the house. Marshal Newlin followed him down a hallway to a kitchen table. As they were walking down the hall, Marshal Newlin again asked if anyone else was in the house. McMullin replied, "No.

I'm just having coffee with my uncle." Marshal Newlin asked for the uncle's name and McMullin responded, "Carroll."

When they arrived at the kitchen, Marshal Newlin saw an older man sitting at the table. McMullin said, "This is my uncle. We're just sitting here having coffee." Marshal Newlin again asked if anyone else was present in the house. McMullin replied, "No. It's just my uncle and I." However, Marshal Newlin noticed three cups of coffee on the table and asked about the third cup. McMullin reiterated that only he and his uncle were in the house. This conversation lasted between two to three minutes.

At this point, Marshal Newlin heard Marshal Davis yell from outside the house, "Get down. Get down on the ground." Marshal Newlin attempted to leave the house through a back door, but could not find his way through the house. McMullin showed Marshal Newlin the way to the back door.

Marshal Newlin emerged from the house into the backyard and saw Marshal Davis and Daryl Crowder in an area near the back door. Crowder was prone on the ground, with his hands on top of his head. Marshal Newlin asked Crowder for his identity; Crowder replied with his correct name.

McMullin also emerged from the back door of the house. Marshal Newlin asked McMullin about Crowder's identity. McMullin first said he did not know, and then said his name was Thomas Junior. Marshal Newlin told McMullin to turn around because he was being detained. McMullin complied and Marshal Newlin handcuffed him. Marshal Newlin again asked about the man's identity. McMullin said that "he told me his name was Thomas Junior." Marshal Newlin then warned McMullin about obstruction of justice.

Although it was an early morning in October, McMullin wore only gym shorts and sandals. Marshal Newlin then said, "Well, let's go back into the house and talk." Marshal Newlin had to physically bring the handcuffed McMullin into the house before following him into the breakfast area.

By this time, Evelyn Moore, McMullin's aunt, also sat at the kitchen table.[1] Marshal Newlin asked McMullin if he felt comfortable talking in front of his aunt and uncle. McMullin replied, "Yeah, that's fine, I'll talk. You know I don't have a problem talking in front of them." Marshal Newlin told McMullin that he knew the identity of the man in the backyard. McMullin dropped his shoulders and said, "Yeah, that's Daryl Crowder."

When he returned to the kitchen, Marshal Newlin noticed some ammunition in an ashtray sitting on a desk. He then told McMullin that he had seen the bullets and asked whether there were guns in the house. McMullin said, "Yes, there are," motioning his head toward a wall by the kitchen. Marshal Newlin looked in that direction and observed seven long guns lined up along the wall. Additionally, Moore told Marshal Newlin about the location of a handgun in a desk drawer. The marshals seized these firearms, which Marshal Newlin had not noticed during his first visit to the house. Marshal Newlin had not drawn his service weapon during these events, nor did he give *Miranda* warnings to McMullin.

## II. Procedural History

Following an investigation, a grand jury indicted McMullin for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). After his initial appearance, McMullin moved to suppress the firearms evidence seized from his

---

[1]The record does not clearly reveal when the aunt entered McMullin's kitchen. The third coffee cup may have been hers, or possibly Crowder's. The record does not disclose this information.

house, asserting that the search violated his reasonable expectation of privacy in his house as guaranteed by the Fourth Amendment to the United States Constitution.

In the motion to suppress, McMullin argued that Marshal Newlin had no legal authority to be in his house. In his reply to the government, McMullin further stated that Marshal Newlin's re-entry fell outside the scope of consent. Meanwhile, the government argued that McMullin gave Marshal Newlin consent to enter the house and never revoked it. At the suppression hearing, the government presented its evidence, and McMullin testified on his own behalf. He testified, contrary to his grand jury testimony, that he never gave consent for the marshal to enter his house. Instead, McMullin stated that just after Marshal Newlin arrived at his front door, McMullin heard shouts coming from the rear of the house. After hearing this shouting, Marshal Newlin allegedly drew his service pistol and ran into the house, looking for the back door.

In his Report and Recommendation, the magistrate judge recommended denying McMullin's motion to suppress and found McMullin's version of the facts to lack credibility. McMullin filed an objection to the report. In June 2008, the district court issued its order, adopting the magistrate's recommendation and denying McMullin's motion to suppress. McMullin filed a motion to reconsider, asking the district court to accept Marshal Newlin's report on the firearms seizure as additional evidence, and then raised a new ground for suppression: that the consent did not continue for Marshal Newlin to re-enter the house. In July 2008, the district court denied McMullin's motion to reconsider.

On July 24, 2008, McMullin pleaded guilty to being a felon in possession of a firearm as charged in the indictment. However, McMullin reserved his right to appeal the district court's ruling on his motion to suppress.

The district court sentenced McMullin to fifty-six months' imprisonment, three years' supervised release, and a $100 special assessment. McMullin timely appealed, arguing, among other things, that Marshal Newlin had no legal authority to re-enter McMullin's house.

## III. Discussion

The dispositive issue presented on appeal is whether the second warrantless entry into McMullin's house by Marshal Newlin violated the Fourth Amendment. We turn to that issue.

This Court reviews factual findings underlying the district court's denial of a motion to suppress for clear error and the question of whether the Fourth Amendment has been violated de novo. *See United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008).

In this case, it is important to recall the Fourth Amendment to the United States Constitution:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This amendment fundamentally protects a person from unreasonable searches. *Id.*

In particular, Fourth Amendment law recognizes the inherent sanctity of a person's house. "The caselaw has consistently recognized that considerably more protection is to be afforded a home than other premises. The leading decisions . . . are each heavily predicated upon the ancient precept that 'a man's home is his castle.'" *United States v. Agrusa*, 541 F.2d 690, 700 (8th Cir. 1976); *see also Payton v. New*

*York*, 445 U.S. 573, 588-90 (1980). Therefore, "to search a private place, person, or effect, law enforcement must obtain from a judicial officer a search warrant supported by probable cause." *United States v. Williams*, 346 F.3d 796, 798 (8th Cir. 2003).

It is therefore well-established that the police may not invade a person's house without a warrant except under very limited circumstances, such as the presence of exigent circumstances or an occupant's consent. Exigent circumstances permit warrantless entries when "lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). Additionally, the consent of a house's occupant makes a warrantless entry into a house reasonable for the purposes of the Fourth Amendment. *See United States v. Spotted Elk*, 548 F.3d 641, 652 (8th Cir. 2008).

In this circuit, we recognize that when an occupant of the house gives consent for entry, he must make an unequivocal act or statement to indicate the withdrawal of the consent. *See United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005). "Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement." *United States v. Gray*, 369 F.3d 1024, 1026 (8th Cir. 2004). If equivocal, police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority. *See Sanders*, 424 F.3d at 774.

Additionally, "[t]he standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). In assessing the scope of a person's consent, we must examine the totality of the circumstances, which includes the language of a person's consent and his actions during the officers' search. *See United States v. Starr*, 533 F.3d 985, 996 (8th Cir. 2008).

After reviewing de novo the constitutionality of the search of McMullin's house, we conclude that the search violated McMullin's Fourth Amendment rights. Neither party contests on appeal that Marshal Newlin received McMullin's consent to enter the house the first time, making the initial warrantless entry valid. In dispute, however, is Marshal Newlin's second entry into McMullin's house, following the handcuffing of McMullin in the backyard.[2]

The government contends that McMullin's initial consent continued to the second entry because McMullin never effectively withdrew the consent. The cases relied upon by the government for this proposition, however, are distinguishable in that Marshal Newlin actually left and then re-entered the house after detaining McMullin in the backyard, having to physically bring him into the house. For example, in *United States v. Parker*, 412 F.3d 1000, 1001 (8th Cir. 2005), the officers remained in the house during the entire search. In *Sanders*, 424 F.3d at 771-72, the agent also never left the hotel room being searched. The government further relies on *United States v. Diaz*, 814 F.2d 454, 459 (7th Cir. 1987), in which the Seventh Circuit permitted a second entry when the officer originally entered with consent, established the existence of probable cause to effectuate an arrest or search, and momentarily stepped out to seek help from other officers. Here, however, Marshal Newlin did not leave McMullin's house to seek help, did not establish probable cause to search the house, and in fact fulfilled his visit's purpose by arresting Crowder and detaining McMullin outside of the house in the backyard.

None of these cases support the government's proposition that Marshal Newlin had legal authority to re-enter McMullin's house under the circumstances. In fact, the

---

[2]Although McMullin does not claim Marshal Newlin arrested him in the backyard, the detention of McMullin may well have required *Miranda* warnings, which were not given, because Marshal Newlin talked to McMullin about obstruction of justice and handcuffed him. However, we do not rest our decision on whether the handcuffing constituted an arrest.

language of one of the cases cited by the government does not necessarily support the second entry in this case. *See id.* ("We do not intend to suggest by our analysis that one consensual entry means that law enforcement agents may thereafter enter and exit a home at will.").

The precise issue here is not withdrawal of consent, but whether, as McMullin argues, a new consent was required for the second entry. By the time Marshal Newlin sought re-entry into McMullin's house, it is undisputed that the marshals had already completed their task of arresting Crowder in the backyard. There was no necessity or legal basis for the officer to re-enter the house. Under the circumstances of this case, we determine that Marshal Newlin's re-entry exceeded the scope of McMullin's consent and therefore violated the Fourth Amendment prohibition against unreasonable entries into a person's house. *Cf. United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001) (determining that a trooper's detention of defendant "past the point necessary to complete his traffic stop investigation exceeded the scope of a lawfully initiated traffic stop.").

We have examined the second entry cases in this circuit, none of which support a second, warrantless entry under the facts presented by the record. For example, in *United States v. Carter*, 854 F.2d 1102, 1104-06 (8th Cir. 1988), the officers first entered the motel room without a search warrant but with consent, and a second time, pursuant to a warrant issued based on plain view observation of cocaine on a table. *Carter* suggests that the proper procedure here should have been to secure a search warrant prior to the second entry. *Carter* also discusses exigent circumstances relating to an officer's entry to a motel room to obtain clothes, mentioning similar circumstances in *United States v. Gilbert*, 774 F.2d 962, 963-64 (9th Cir. 1985), but these entries were made pursuant to consent as well. *See* 854 F.2d at 1106. Importantly, however, *Carter* notes the expectation of privacy associated with a person's house. *Id.* at 1105. Furthermore, in *United States v. Weston*, 443 F.3d 661, 665 (8th Cir. 2006), a first search occurred pursuant to consent, while a subsequent

search followed the issuance of a search warrant. Finally, in *United States v. Lakoskey*, 462 F.3d 965, 974 (8th Cir. 2006), this Court concluded that an officer's second warrantless entry without consent or exigent circumstances violated the Fourth Amendment.

The government further argues that exigent circumstances, in the form of Marshal Newlin's safety, made the re-entry reasonable under Fourth Amendment law. Although officer safety indeed constitutes exigent circumstances permitting a warrantless search, *see United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005), this exception is inapplicable in light of the facts presented by the record. There was no testimony that the marshals feared Crowder and McMullin, and in any event, both had been detained and handcuffed in the backyard.[3] As for the other occupants of the house, Marshal Newlin's testimony is insufficient to justify his re-entry into the house on grounds of officer safety. For example, Marshal Newlin did not testify that the occupants of the house acted belligerently or in a hostile manner. He did not testify that Crowder or McMullin signaled to the occupants in the house for help. Marshal Newlin did testify, however, that he observed no firearms or ammunition during his first visit in the house. On this record, it is not apparent that officer safety required re-entering the house, as opposed to keeping Crowder and McMullin in the backyard or taking them to the marshals' vehicle.

The government also urges this Court to join several other circuits in recognizing a defendant's scant clothing to constitute exigent circumstances permitting a warrantless entry in search of proper clothing for the defendant.[4] *See,*

---

[3]In the context of vehicle searches, the Supreme Court recently held that "*Belton* does not authorize a vehicle search incident to a recent occupant's arrest *after the arrestee has been secured and cannot access the interior of the vehicle*." *Arizona v. Gant*, 129 S. Ct. 1710, 1714 (2009) (emphasis added).

[4]In the district court, however, the government did not contend that McMullin's partially clothed status created an exigent circumstance.

*e.g.*, *United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000) (determining that a defendant's lack of shirt and shoes while outdoors justified an officer's warrantless re-entry into the house); *United States v. Butler*, 980 F.2d 619, 621-22 (10th Cir. 1992) (permitting police to retrieve a defendant's shoes from his house, but noting that entry into the house does not immediately follow from "the desire of law enforcement officers to complete the arrestee's wardrobe"); *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (allowing an officer's entry into a bedroom solely for the purpose of maintaining control over defendant while she dressed herself). However, McMullin wore shorts and sandals, missing only a shirt. Marshal Newlin did not re-enter the house to retrieve a shirt for McMullin in a "carefully circumscribed [area] to minimize the intrusion," as in *Gwinn*, 219 F.3d at 330, or to maintain control over McMullin while he dressed himself, as in *Di Stefano*, 555 F.2d at 1101. Instead, he brought McMullin into the house as part of a further investigation. This record does not establish circumstances considered exigent which would validate a re-entry into McMullin's house.

## IV.  Conclusion

For the foregoing reasons, we reverse the district court, vacate its judgment, and remand for further proceedings in accordance with this opinion.

MURPHY, Circuit Judge, dissenting.

I respectfully dissent from the majority's conclusion that appellant McMullin's consent to Deputy U.S. Marshal Newlin's presence in his kitchen ended before appellant pointed out the firearms that were present in his home.

The Fourth Amendment suppression issue here cannot be resolved without careful consideration of how the fast moving events unfolded within minutes after Newlin's consented entry into McMullin's home.   Sounds from Crowder's

apprehension in the backyard caused Newlin and McMullin to step outside. Then, after McMullin had clearly lied about Crowder's identity, Newlin warned him about obstruction of justice, handcuffed him, and said "Well, let's go back into the house and talk." McMullin said nothing in response. He made no objection of any kind to Newlin's reentry, only indicating that because of the handcuffs he needed assistance to manage the high step.

Back inside the house, McMullin did not protest or ask Newlin to leave. Instead, McMullin sat down at the kitchen table with the deputy and his aunt and uncle. Deputy Newlin asked McMullin whether he minded answering questions in front of his aunt and uncle. McMullin said "Yeah, that's fine, I'll talk," and then admitted that he had known the man staying in his home was Crowder. After Newlin noticed ammunition in an ashtray, he asked McMullin whether there were firearms in the house. McMullin pointed to seven firearms lined up against the wall, and his aunt volunteered that a handgun was stashed in a desk drawer. Knowing that McMullin had a felony record, the deputy arrested him and seized the firearms.

It is undisputed that there was valid consent by McMullin for Deputy Newlin to enter his home at the outset. Once consent is given, it may be withdrawn, but only by an "unequivocal act or statement." United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) (expressions of impatience do not amount to an unequivocal statement of withdrawal); United States v. Martel-Martines, 988 F.2d 855, 858 (8th Cir. 1993) (passively watching in silence as search was expanded not sufficient to withdraw consent); see also United States v. Sanders, 424 F.3d 768, 775 (8th Cir. 2005) (repeated use of hands to block officer's search of pockets demonstrated unequivocal withdrawal of consent).

Newlin left the house only to go into the backyard to assist his partner who was attempting to arrest Crowder. In the yard McMullin incriminated himself which gave Newlin reason to talk to him further. McMullin made no objection to his returning

inside, and Newlin's reason for reentering was within the scope of the consent granted by McMullin which was to talk and ask questions. See United States v. Castellanos, 518 F.3d 965, 970 (8th Cir. 2008) (distinguishing consent for officer merely to enter from consent to a search). Newlin's reentry was thus a continuation of his consented presence in the house.[5]

The burden remained on McMullin to withdraw affirmatively and unequivocally his consent for Newlin to be inside his home. The district court found that McMullin never withdrew his consent—a factual finding that we review for clear error, see Gray, 369 F.3d at 1026–27, and I see none. To ascertain whether McMullin withdrew his consent, we ask what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." Florida v. Jimeno, 500 U.S. 248, 251 (1991). There is no evidence in the record to indicate that McMullin ever withdrew his consent, much less that he did so by an "unequivocal act or statement." Gray, 369 F.3d at 1026.

McMullin had the opportunity to communicate that he did not consent to Newlin's reentry, but he did nothing of the sort. He nevertheless now argues that Newlin should have understood that his consent had been withdrawn because he had to help McMullin back into the house and because McMullin would have been afraid to refuse him entry after watching the deputies arrest Crowder. This explanation is not only late, but it is unpersuasive because McMullin did not take any action to communicate that his consent was withdrawn. After Newlin suggested that the two men go back into the house, McMullin indicated that he physically could not make the step. This could reasonably have been interpreted as a request for Newlin's assistance and continuing consent to Newlin's presence. Moreover, McMullin never told Newlin that he was afraid not to let him in. Withdrawal of consent requires an "unequivocal

---

[5]The majority expresses concern about any rule that would permit law enforcement officers to "enter and exit a home at will" after once obtaining consent to enter. The facts of this case, however, have nothing to do with "at will" entries.

-13-

act or statement" which makes an officer aware that it has been withdrawn. Gray, 369 F.3d at 1026.

McMullin also acquiesced in Newlin's questioning after they were back inside. See United States v. Parker, 412 F.3d 1000, 1002 (8th Cir. 2005) (holding that a suspect's assistance to officers conducting a search was inconsistent with having withdrawn consent for that search).  Under these circumstances a reasonable person could conclude that McMullin had not withdrawn his consent, and in fact, McMullin himself testified before the grand jury that he had "*allowed* [the deputies] to search [his] bedroom and every other area of the house they wanted to." (emphasis added).

None of the cases cited by the majority, including United States v. Weston, 443 F.3d 661 (8th Cir. 2006), United States v. Lakoskey, 462 F.3d 965 (8th Cir. 2006), and United States v. Carter, 854 F.2d 1102 (8th Cir. 1988), involve facts remotely analogous to those in this case.  In Weston and Carter, the police saw contraband during a consented entry but seized it only after obtaining a search warrant.  443 F.3d at 665; 854 F.2d at 1105.  The suggestion that Newlin should have obtained a search warrant ignores the critical fact that he had not entered the home in order to search, but rather only to question McMullin.  Lakoskey, 462 F.3d at 974, is inapposite because there the defendant specifically refused to allow officers to enter his home.

Given the lack of evidence that McMullin ever made an unequivocal act or statement to withdraw his consent for Deputy Newlin to be in his house, the majority seeks to reframe the question to be whether McMullin ever granted a second consent to enter.  As support for that theory, it urges that the purpose for the deputies' visit had been accomplished once Crowder was arrested.  That approach overlooks the fact that the intervening events had raised reasonable suspicion about whether McMullin had violated the law by knowingly harboring Crowder or by obstructing justice in lying about his identity.  The deputies were not required to ignore evidence that another crime may have been committed.  McMullin told Newlin several lies about Crowder's

presence and identity, raising a reasonable suspicion that McMullin had made a false statement to a federal agent.  See 18 U.S.C. § 1001 (2009); United States v. Lanier, 578 F.2d 1246, 1249 (8th Cir. 1978) (knowingly and willfully making a false statement related to a material matter within federal jurisdiction).  Newlin was therefore justified in detaining McMullin for further questioning.  See Terry v. Ohio, 392 U.S. 1 (1968).

McMullin's house was a practical and appropriate location for further questioning, and Newlin had a legal basis for reentering the house.  McMullin and Newlin had been standing within the curtilage, McMullin had left the back door open, and was only wearing gym shorts on a chilly morning.  See United States v. Montano-Gudino, 309 F.3d 501, 503–04 (8th Cir. 2002) (reasonable to move a suspect inside for questioning when it was snowing heavily).  Newlin would have been justified in arresting McMullin for making false statements, and his decision to question McMullin inside his house was not unreasonable.  Once inside, Newlin did not conduct a protective sweep or search of the residence, and there is no evidence that his reentry was a pretext to search.  It was only when he saw the ammunition in plain view that he asked if there were any firearms.

Since Newlin had legal authority to be in McMullin's house when he saw the ammunition in plain view and McMullin pointed out the firearms, I would affirm the district court and respectfully dissent from the suppression of this legally obtained evidence.

_____