# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-3023

_____

United States of America

*Plaintiff - Appellee*

v.

Cornell Williams

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 10, 2023
Filed: August 16, 2023

_____

Before SHEPHERD, STRAS, and KOBES, Circuit Judges.

_____

STRAS, Circuit Judge.

Cornell Williams conditionally pleaded guilty to possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). Although he argues the district court[1] should have suppressed the gun and shell casing found in his apartment, we affirm.

---

[1]The Honorable Robert F. Rossiter, Chief Judge, United States District Court for the District of Nebraska.

# I.

A 911 caller reported that someone in a nearby apartment had just shot a gun from a balcony. The caller said the unit number was 32 and described the shooter as a man in a wheelchair. It so happens that the occupant of that apartment was Williams, who matched the description.

Upon their arrival 20 minutes later, officers confirmed the 911 caller's account and talked to other witnesses. One implied that multiple people could be inside.

The officers approached Apartment 32 cautiously with their guns drawn. There was initially no response when they knocked on the door, but Williams answered about a minute later. Once he did, he began rolling his wheelchair backward. The officers entered the apartment to pat him down, but they found nothing. One then asked for permission to conduct a quick sweep of the unit to make sure no one else was there. Williams replied, "[y]es ma'am. You can do whatever you want."

Once the sweep of the surrounding rooms was complete, Williams complained about some sketchy characters that he had seen hanging out near the trash cans below his balcony. One of the officers walked over to get a better look and spotted a spent shell casing in plain view.

Given the report of earlier gunfire, the discovery of the shell casing led to more questions. Williams denied having a gun and added that he could not explain how the shell casing ended up on the balcony. In the process, he admitted that, as a convicted felon, he could not possess either.

Williams finally confessed to being the shooter after the officers mentioned a search warrant. He also admitted that he hid the gun in a kitchen cabinet. At his direction, they opened the cabinet and retrieved it.

The government charged Williams with illegally possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). After the district court denied his motion to suppress the evidence they found, he conditionally pleaded guilty. On appeal, Williams challenges the steps the officers took from the moment they entered his apartment. We have a split standard of review under the Fourth Amendment: de novo for legal conclusions and clear error for any factual findings. *See United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015).

II.

We start with the pat down. Williams views it as constitutionally problematic because the officers entered his apartment without a warrant.

Entering a home without a warrant to conduct a search is presumptively unreasonable under the Fourth Amendment. *See Kentucky v. King*, 563 U.S. 452, 459 (2011). The key word is presumptive: there are exceptions. One of them is for "exigent circumstances," *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995), which allows officers to conduct a search if they have an "objectively reasonable" concern "for the safety of themselves or others," *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) (citation omitted).

Consider the situation the officers faced here. There were multiple eyewitnesses who said that someone in a wheelchair in Apartment 32 had fired a gun. *See* Omaha, Neb., Mun. Code § 20-196 (prohibiting the "discharge [of] an instrument which releases a projectile by means of an explosive charge" in the city). When Williams finally answered the door, the officers were face-to-face with a man who matched the description of the shooter.

Now consider their options. They could have stood at the door and questioned a potentially armed suspect—someone who minutes before had allegedly fired a gun from his balcony. *See United States v. Roberts*, 824 F.3d 1145, 1146–47 (8th Cir.

2016) (discussing the problems with this option). They could have retreated and applied for a warrant, which would have left other occupants of the building and anyone inside Williams's apartment in potential danger. Or they could do what they did here: enter for the limited purpose of patting him down for a weapon before questioning him. *See United States v. Valencia*, 499 F.3d 813, 816 (8th Cir. 2007) (explaining that officers could enter an apartment after a shots-fired call to "discern if the shooter . . . remained inside"). The Fourth Amendment allowed them to avoid further danger and "ensure [their] own safety" first. *Lange v. California*, 141 S. Ct. 2011, 2017 (2021); *see Vance*, 53 F.3d at 222 n.4 (explaining that officers are not required to alleviate danger by "leaving the area").

It goes too far to suggest, as Williams does, that we are creating a new "gun exception" to the warrant requirement. Someone having a gun in their home does not create an exigency on its own. *See United States v. Quarterman*, 877 F.3d 794, 798 (8th Cir. 2017); *see also United States v. Murphy*, 69 F.3d 237, 243 (8th Cir. 1995). Rather, what matters is that Williams illegally fired it minutes before the officers arrived. *See Valencia*, 499 F.3d at 816 (allowing officers to "enter the apartment without a warrant to secure the []gun and to discern if the shooter or any victims in need of medical attention remained inside" after a shots-fired call). A suspect who has just illegally used a gun is on different Fourth Amendment footing than someone who merely possesses one. *See United States v. Jones*, 635 F.2d 1357, 1361 (8th Cir. 1980).

III.

Another exception to the warrant requirement covers just about everything that happened next. First, when the officers asked Williams whether they could "look" around "to make sure there's nobody else in the apartment," he replied, "[y]es ma'am. You can do whatever you want." Based on that reply, he consented to *at least* a protective sweep of the apartment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (explaining the "well[-]settled" rule that consent negates the need for a warrant under the Fourth Amendment); *United States v. Alatorre*, 863 F.3d

810, 813 (8th Cir. 2017) (describing a protective sweep as "a quick and limited search of [a] premises . . . conducted to protect the safety of police officers or others" (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990))).

Second, after Williams blurted out that there had been suspicious activity outside, it was reasonable for the officers to believe that Williams had provided consent to look there. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (using objective criteria to determine consent). Particularly after he told one of the officers just moments before that she could "do whatever [she] want[ed]." *See United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006) (allowing a search "within the boundaries of [the defendant's] consent"). The officer was then free to seize the spent shell casing that was in plain view on the balcony. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465–66 (1971) ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").

Third, consent extended to the retrieval of the gun itself after Williams confessed to "fir[ing] the shot" and admitted that the gun was in a kitchen cabinet. After all, he said "yes" when the officers asked him to move away "so they [could] grab it," and then told them its exact location when they had trouble finding it. It is hard to imagine a clearer instance of consent through words and actions.[2] *See United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009) ("In assessing the scope of a person's consent, we must examine the totality of the circumstances, which includes the language of a person's consent and his actions during the officers' search.").

---

[2]Asking Williams for permission was the right move. Exigent circumstances would not have justified a protective sweep of the kitchen cabinets. Nobody could hide in there, so there was no risk that someone would jump out and start shooting. *Cf. Buie*, 494 U.S. at 328–29, 334 (allowing officers to search a basement while serving an arrest warrant because it could have contained a hidden gunman).

## IV.

We accordingly affirm the judgment of the district court.

_____