# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1823

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | Appeals From the United States |
| Rashad McKay, also known as | * | District Court for the |
| Rashod McKay, | * | District of Nebraska. |
| | * | |
| Appellant. | * | |

_____

No. 05-2032

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Sterling McKoy, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 17, 2005
Filed: December 13, 2005

_____

Before SMITH, HEANEY, and BENTON, Circuit Judges.

_____

HEANEY, Circuit Judge.

Following a jury trial, Rashad McKay and Sterling McKoy were found guilty and convicted of conspiracy to distribute cocaine base (crack). The district court[1] sentenced McKay to 210 months of imprisonment, and McKoy to 300 months. Both defendants contend that: (1) the evidence was insufficient to sustain their convictions, (2) the court committed evidentiary error by admitting evidence of McKoy's gang membership and alias, (3) the court committed sentencing error by sentencing them on the basis of drug quantities not proven to a jury, and (4) their sentences are unreasonably long. McKay further alleges that his rights under the Speedy Trial Act and Interstate Agreement on Detainers were violated by pretrial delay, and that the court erroneously admitted hearsay evidence under the coconspirator exception. McKoy additionally claims that the government violated Batson v. Kentucky, 476 U.S. 79 (1986), by striking the only African American venireperson, the district court erred in failing to suppress evidence from an illegal arrest, and the district court incorrectly calculated his criminal history. We affirm.

**BACKGROUND**

On June 18, 2003, cousins Rashad McKay and Sterling McKoy were indicted for conspiracy to distribute fifty grams or more of crack from October of 1998 through June of 2003. At trial, the government presented evidence from several witnesses, many of whom were cooperating coconspirators. Each of these witnesses testified consistently about large-scale drug dealings with McKay and McKoy in and around Omaha, Nebraska.

---

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

Kevin Birdine was indicted with McKay and McKoy, pled guilty, and testified against his codefendants. Birdine knew both McKoy and McKay from drug dealings with them early in 1998. He testified that he escaped from a halfway house in the spring of 2003. After Birdine's escape, he again started dealing drugs with McKoy. McKoy obtained nine ounces of powder cocaine from Marcell Bennett, cooked it into crack, and gave Birdine a portion to sell. Shortly thereafter, McKoy obtained nine more ounces of powder cocaine, cooked it into crack again, and again divided it with Birdine. Birdine and McKoy continued their endeavor for some time, purchasing between six ounces and eighteen ounces of powder cocaine at a time, converting it to crack, and selling it. This continued until Birdine was apprehended on June 6, 2003.

Marcell Bennett corroborated Birdine's story. Bennett testified that he received a small amount of crack twice from McKoy in 1998 or 1999. Then in 2000 or 2001, Bennett became one of McKoy's sources, selling McKoy powder cocaine that McKoy converted to crack. By Bennett's estimate, he sold McKoy about eight kilograms of crack over an eight-month period.

Victor Henderson testified that he also sold cocaine and crack to Birdine and McKoy. They engaged in four transactions from March to May of 2003. The first time Henderson sold six ounces of cocaine. The next two sales involved nine ounces. Finally, Henderson sold Birdine and McKoy eighteen ounces of cocaine. On one occasion, Henderson saw Birdine and McKoy cooking the powder into crack.

From 1998 through his arrest on October 6, 2001, William Watson dealt crack to McKoy. According to Watson, McKay pooled his money with McKoy for three purchases in 1998, and the two received four and one-half ounces of crack from Watson each time. In October of 1998, McKay moved to Denver. After that, McKay dealt with Watson on his own, usually buying four and one-half or nine ounces of cocaine or crack from Watson. In November of 2000, Watson saw McKay at an

associate's residence with McKoy. Watson bought six ounces of cocaine from McKoy that day, which McKoy had received from McKay.

Levi Brown testified that he knew both McKoy and McKay. In the early part of 1998, Brown purchased crack from McKoy. He knew that both McKoy and McKay had moved to Denver, but that McKoy moved back to Omaha after a few months. Brown remained in contact with McKay while McKay was in Denver. At least three times in 2000, McKay returned to Omaha and sold Brown eighteen ounces of powder cocaine each time. Brown testified that he knew that McKay was McKoy's source, and that most of his deals with McKoy involved cocaine McKoy received from McKay in Denver.

Greg Figures knew both McKoy and McKay and dealt drugs with both of them. He started dealing with McKoy in 1997, selling McKoy relatively small amounts of crack. McKoy eventually started buying more crack from Figures, including quantities as large as nine ounces. Figures testified that he bought drugs from McKay twice after McKay moved to Denver. When McKay came to Omaha, he went to Figures's residence and sold Figures a kilogram of powder cocaine. McKay cooked half of this quantity into crack so as to assure Figures that it would easily convert. A few weeks later, McKay, accompanied by McKoy, again went to Figures's residence, and Figures bought another kilogram of cocaine from McKay.

Terrell Reed grew up with McKoy and McKay. During the charged period, Reed bought several ounces of crack from McKoy. McKoy told Reed that he got the drugs from his cousin, Rashad. Jeremy Smith stated that he dealt with McKoy from the summer of 1999 until his arrest on October 25, 2001. He testified that he had at least ten deals with McKoy, selling him more than 100 ounces of crack and powder cocaine.

In response to the above evidence, McKay and McKoy called two cellmates of Birdine's and Bennett's. One of these witnesses testified that he overheard Birdine and Bennett say that they were going to testify falsely. The other witness heard Birdine brag that his testimony was going to result in life sentences for McKay and McKoy. McKoy and McKay also called a number of witnesses who testified that they both maintained jobs, lived frugally, and were good members of the community.

The jury received the case on June 1, 2004, and returned guilty verdicts against both defendants the next day. A presentence report was prepared for each defendant, charging them with responsibility for extremely large amounts of crack, and computing very high criminal history categories. Both defendants had guidelines ranges of 360 months to life. The district court departed from a criminal history category V to a IV for McKay based on the view that a category V overstated his criminal history. This decreased McKay's sentencing range to 324 to 405 months. Granting a further 17-month departure to account for the time McKay had spent in custody, the court sentenced McKay to 307 months. McKoy's range remained 360 months to life, but the district court adjusted McKoy's sentence to account for the 12 months he had been in custody, resulting in a sentence of 348 months.

Both defendants appealed. Before their briefs were due, the Supreme Court issued its decision in United States v. Booker, 543 U.S. 220 (2005). Based on the parties' joint motion to remand, our court returned these cases to the district court for resentencing in accordance with Booker. At McKay's resentencing hearing, the district court recalculated the drug quantity at a lower level, resulting in a guidelines range of 262 to 327 months. The court then sentenced outside the guidelines, imposing 210 months of imprisonment, in contrast to its original 307-month sentence. At McKoy's resentencing, the court found that its original guidelines range of 360 months to life still applied, yet gave McKoy the benefit of a lower sentence, imposing 300 months instead of its original 348-month sentence. This appeal followed.

# ANALYSIS

## I.     MCKOY'S ILLEGAL SEIZURE CLAIM

McKoy argues that evidence gathered as a result of an arrest for suspicion of crack possession should have been suppressed because his arrest was not supported by probable cause. We review the district court's factual findings for clear error, but consider its ultimate determination about whether the Fourth Amendment was violated de novo. United States v. Brown, 49 F.3d 1346, 1348-49 (8th Cir. 1995).

Probable cause to arrest exists if the facts and circumstances known to an officer would warrant a person of reasonable caution in believing that the suspect has, is, or will soon, commit an offense. Id. at 1349. Because such a determination rests on the totality of circumstances, "evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause." Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999). To that end, "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." Id.

The facts relied upon by the government to establish probable cause are these: at about 5:00 p.m. on June 1, 2003, Omaha Police Officers Jeffrey Gassaway and George Collins were on patrol as part of their assignment with the gang suppression unit. They saw two cars parked in the lot of Big Jim's gas station and convenience store. The cars, a Dodge Intrepid and a Ford Mustang, were parked parallel to one another but facing different directions, such that their driver's doors were next to one another. The officers heard very loud music emanating from the direction of the cars, and they approached the vehicles. They determined that the music was coming from the Intrepid, which was unoccupied, but had the keys in it and was running. Gassaway noticed two people in the front seats of the Mustang, and McKoy talking

to them through the window, standing between the vehicles. Gassaway recognized McKoy from a prior contact weeks earlier in which he cited McKoy for driving with a suspended license. As Gassaway neared McKoy, McKoy stated that he knew nothing about the Intrepid and arrived at the store in the Mustang. The Mustang's condition, however, belied such a claim: the vehicle's front seats were both occupied, and its back seat was filled with clothes that looked undisturbed. As Gassaway conversed with McKoy, Collins approached the Intrepid so as to turn down the stereo. Before he opened the vehicle's door, he looked through the passenger window and saw what he recognized as crack on the center console.

Clearly, there was probable cause to search the Intrepid, because officers developed a prudent belief that it contained contraband. McKoy does not dispute this, but rather suggests that nothing connected him to the vehicle. He asserts that any suspicion that he was associated with the Intrepid was negated by the fact that no one in Big Jim's knew who drove the Intrepid into the lot, and that a registration check on the Intrepid indicated it was a rental, registered to Sandra Claudio. To be sure, these circumstances are relevant to the probable cause inquiry, but they are not dispositive. Indeed, in this case, these isolated facts are overcome by the totality of circumstances that linked McKoy to the Intrepid. First, he was physically near the vehicle. While the Mustang's occupants were close to the Intrepid as well, they were actually in their vehicle, whereas McKoy was standing between the Intrepid and the Mustang. The Intrepid was still running, leading to a reasonable inference that it had recently been, and would soon be again, occupied by its driver. There were no other vehicles in the parking lot, and McKoy's contention that he arrived in the Mustang was reasonably viewed by the officers as dubious. We thus find no error in the district court's denial of McKoy's suppression motion.

## II.    MCKAY'S SPEEDY TRIAL CLAIMS

McKay argues that his rights under the Speedy Trial Act[2] and the Interstate Agreement on Detainers Act[3] (IAD) were violated because his trial was not held in a timely fashion.  Under the Speedy Trial Act, a federal criminal defendant must be tried within seventy days of the filing of his indictment or his arraignment, whichever is later.  18 U.S.C. § 3161(c)(1).  The IAD provides that when a defendant is in custody and indicted in another jurisdiction for an offense that causes a detainer to be placed on him, the other offense must be tried within 180 days of the prisoner's written request for disposition, 18 U.S.C. app. 2, § 2 art. III(a), or within 120 days of his arrival in the receiving jurisdiction, 18 U.S.C. app. 2, § 2 art. IV(c).  If a defendant's rights under the Speedy Trial Act or the IAD are violated, the court must dismiss the indictment. 18 U.S.C. § 3162(a)(2); 18 U.S.C. app. 2, § 2 art. III(d) & IV(e).  The dismissal may be with or without prejudice.  18 U.S.C. § 3162(a)(2); 18 U.S.C. app. 2 § 9(1).

A notice of detainer was served on McKay, who was in prison in Colorado, on July 7, 2003, and he signed a request for final disposition of the detainer on July 8, 2003.  Thus, the 180 days allotted until trial under the IAD began running on that date.  McKay had his first appearance on September 9, 2003, starting both the 70-day deadline under the Speedy Trial Act and the 120-day deadline under the IAD.

Both acts at issue here contain tolling provisions for certain events.  As relevant to McKay's case, the Speedy Trial Act excludes periods of delay that are due to the filing of pretrial motions by either party, 18 U.S.C. § 3161(h)(1)(F), or to joinder of another defendant, 18 U.S.C. § 3161(h)(7).  The Speedy Trial Act also excludes delay due to a continuance granted by the court to serve the ends of justice

---

[2]18 U.S.C. § 3161.

[3]18 U.S.C. app. 2, §§ 1-9.

such that the public's interest outweighs the defendant's interest in a fair trial. 18 U.S.C. § 3161(h)(8)(A). Similarly, the IAD permits the court to grant "any necessary or reasonable continuance" for good cause. 18 U.S.C. app. 2, art. III(a) & IV(c). The operation of these provisions forecloses McKay's claims. Following McKay's September 9, 2003 arraignment, the court continued the matter until September 22 on the government's motion for detention. On that date, the parties filed a joint motion to continue the detention hearing until October 22, 2003. On November 3, 2003, the court ruled on the motion. On November 24, the government filed a motion to set a trial date. A hearing was held on the motion on December 12, 2003, at which time the court concluded that it could not have a trial until March 29, 2004, and the court specifically concluded that justice would be served by continuing the trial until March 29, 2004. Thus, this period was excluded from speedy trial consideration by operation of the acts. In the meantime, McKoy was arrested. He filed a motion to continue the joint trial on March 16, 2004, and the court granted a continuance until May 24, 2004. The court's order continuing the trial again found that the continuance was necessary to serve the ends of justice. As with the earlier continuance, this finding meant that the delay did not count toward the limits in either the Speedy Trial Act or the IAD. By operation of these statutes and their exclusions, a total of no more than twenty-one days ran from the time of his date of arrival in Nebraska and subsequent arraignment until trial, well under the limits of the Speedy Trial Act (70 days) and the IAD (120 days). Moreover, a total of sixty-three days ran from the date of McKay's request for final disposition to trial, far less than the 180 days allotted by the IAD. Thus, the district court properly refused to dismiss the indictment.

## III.  MCKOY'S BATSON CHALLENGE

In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court reaffirmed the position that the Equal Protection Clause is violated by racial discrimination in jury selection. The Batson Court set forth a procedure for determining if a prosecutor was racially discriminatory in his or her use of peremptory challenges. First, the

defendant must make a prima facie showing of discrimination. The burden then shifts to the government to articulate a race-neutral explanation for the challenge. If the government proffers such a reason, the defendant may show that it is pretextual. Id. at 96-98; United States v. Jones, 245 F.3d 990, 992 (8th Cir. 2001). The court must then make the ultimate determination whether the defendant has shown purposeful discrimination. Batson, 476 U.S. at 98.

The Batson issue in this case concerns the government's use of a peremptory challenge to exclude Joyce Blakey, an African American woman. She was the only minority on the venire. Blakey was employed as the admissions classifications director of the Douglas County Youth Center. She stated during voir dire that she may know Levi Brown, a government witness. She said she thought Brown was a close friend of her daughter's father, and was currently in prison. Blakey also stated that her brother was convicted of a drug offense in Omaha, and was incarcerated in South Dakota. She also had a cousin who was attempting to be pardoned for his felony drug conviction. Blakey also stated that she had previously been employed at a drug treatment center.

After the government struck Blakey, McKoy raised a Batson objection. We assume for purposes of our analysis that McKoy made a prima facie case, since the government struck the only African American person on the venire. For its nondiscriminatory reason, the government stated that Blakey's job often put her in contact with law enforcement officers and criminals; that Blakey's brother was serving time for a drug offense, which was probably a federal conviction; that Blakey's cousin had also been convicted of a felony drug offense; and that she may know one of the government's witnesses. While these reasons may or may not have supported striking Blakey for cause, they are certainly appropriate nondiscriminatory reasons for removing Blakey by way of a peremptory strike. See United States v. Roebke, 333 F.3d 911, 913 (8th Cir. 2003) ("If there is no inherently discriminatory intent in the prosecutor's explanation, 'the reason offered will be deemed race

neutral.'" (quoting Purkett v. Elam, 514 U.S. 765, 768 (1995))); see also Batson, 476 U.S. at 89 (recognizing that peremptory challenges can be used by the government to strike jurors for any racially neutral reason related to the potential juror's perceived view of the case).

## IV.  CLAIMED EVIDENTIARY ERROR

Both McKoy and McKay argue that the district court committed reversible error by admitting evidence that McKoy was involved in the 40th Avenue Crips gang, and went by the alias "Mafioso." McKay further argues that the court impermissibly admitted two hearsay statements of coconspirators.

We review district court rulings on the admission of prejudicial evidence such as alleged gang affiliation for an abuse of discretion. United States v. Sparks, 949 F.2d 1023, 1026 (8th Cir. 1991). While "[e]vidence of gang membership is admissible if relevant to a disputed issue," United States v. Lemon, 239 F.3d 968, 971 (8th Cir. 2001), gang affiliation evidence is not admissible where it is meant merely to prejudice the defendant or prove his guilt by association with unsavory characters, United States v. Roark, 924 F.2d 1426, 1433-34 (8th Cir. 1991); see also United States v. Bradford, 246 F.3d 1107, 1117 (8th Cir. 2001) ("To be certain, there is great potential for prejudice when evidence regarding gangs is at issue.").

During cross-examination of Officer Gassaway, McKoy established that Gassaway had failed to perform any type of controlled buy from McKoy. On redirect, Gassaway explained that controlled buys typically involve cooperating individuals who have access to the suspect. Gassaway went on to note that for McKoy, those candidates would have been his fellow members of the 40th Avenue Crips, but since they were all under indictment or in custody, officers could not penetrate McKoy's circle of dealers. While McKoy's street name of "Mafioso" was referenced, we cannot say that this merits reversal. First, we note that this occurred three times over

six days of testimony. Moreover, in its jury instructions, the court cautioned the jury about its use of gang membership evidence, stating that with regard to a conspiracy, "merely being a member of a gang[] does not prove that a person has joined in an agreement or understanding." (Jury Instruction 11.) Because the limited gang-related testimony was relevant on redirect as to why the government did not attempt a controlled buy, and because the court cautioned the jury against using gang affiliation as a ground for conviction, we find no abuse of discretion in admitting such evidence.[4]

McKay challenges the admission of two hearsay statements. In the first, Birdine said that when he escaped from custody in 2003 and began dealing with McKoy, McKoy told him that McKay was sending him drugs from Denver. In the second, Terrell Reed testified that McKoy asked Reed to pool their money so that they could buy from McKay. We review the admission of these statements for an abuse of the district court's discretion, "'keeping in mind that its discretion is particularly broad in a conspiracy trial.'" United States v. Manfre, 368 F.3d 832, 837 (8th Cir. 2004) (quoting United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997)).

The Federal Rules of Evidence deem an out-of-court statement not hearsay if it is offered against the defendant and is a statement of the defendant's coconspirator made in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(D); Manfre, 368 F.3d at 837. Although we interpret the phrase "in furtherance of the conspiracy" broadly, "a statement that simply informs [the] listener of the declarant's criminal activities is not made in furtherance of the conspiracy." Manfre, 368 F.3d at 838-39.

---

[4]With regard to McKay, witnesses affirmatively stated that McKay was not in a gang. While McKay argues that the issue of gang membership and affiliation so permeated the proceedings as to prejudice his right to a fair trial, we respectfully disagree.

Both of the challenged statements fall within the coconspirator exception to the hearsay rule. Birdine stated that McKoy told him he was getting cocaine from McKay in Denver to inform Birdine about their drug source. Birdine was clearly a conspirator, and the statement was made to keep Birdine abreast of changes in the conspiracy that had taken place while Birdine was in prison. As to the statement to Reed, Reed was also obviously a conspirator, as he was purchasing large amounts of crack from McKoy. When McKoy asked Reed to pool their money to get more cocaine from McKay, it was a statement in furtherance of the conspiracy, since McKoy was trying to acquire more drugs to sell. Admission of these statements was not an abuse of discretion.

## V. SUFFICIENCY OF THE EVIDENCE

Both defendants challenge the sufficiency of the evidence. They assert that the evidence linking them to a conspiracy to distribute crack came from unreliable government witnesses who were highly motivated to lie, and was outweighed by their credible evidence that they were good citizens who held jobs and lived modestly. "When reviewing a jury verdict for sufficiency of the evidence, we view the evidence in the light most favorable to the jury's verdict, overturning it only if no reasonable jury could conclude that the government has proven all the elements of the offense beyond a reasonable doubt." United States v. Cole, 380 F.3d 422, 425 (8th Cir. 2004). To support a conviction for conspiracy, the government must show the existence of a conspiracy for an illegal purpose, and the defendant's knowledge and intentional association with the conspiracy. United States v. Maynie, 257 F.3d 908, 916 (8th Cir. 2001). Attacks on the sufficiency of the evidence that call upon this court to scrutinize the credibility of witnesses are generally not an appropriate ground for reversal. Cole, 380 F.3d at 425 ("It is the task of the jury to evaluate the credibility of witnesses.").

In this case, there was more than sufficient evidence to support the defendants' participation in the conspiracy to distribute crack. Many witnesses, including Kevin Birdine, Marcel Bennett, Victor Henderson, William Watson, Terrell Reed, and Greg Figures testified that they bought or sold cocaine or crack to the defendants. While Birdine and Bennett were both impeached by witnesses who claimed they were lying, this is generally not a basis for reversal. Rather, it is something for the jury to consider. Even without their testimony, there was evidence of both McKay's and McKoy's large-scale dealing during the charged timeframe. There is simply no merit to the defendants' sufficiency of the evidence claim.

## VI. SENTENCING ISSUES

Both defendants assert that the district court erred when it sentenced them based on drug quantity found by a preponderance of the evidence, rather than amounts proven to the jury. This claim has been squarely rejected by our circuit. See, e.g., United States v. Pirani, 406 F.3d 543, 551 n.4 (8th Cir. 2005) (en banc) ("Nothing in Booker suggests that sentencing judges are required to find sentence-enhancing facts beyond a reasonable doubt under the advisory Guidelines regime."); United States v. Haack, 403 F.3d 997, 1003 (8th Cir. 2005) ("In determining the appropriate guidelines sentencing range to be considered as a factor under [18 U.S.C.] § 3553(a), we see nothing in Booker that would require the court to determine the sentence in any manner other than the way the sentence would have been determined pre-Booker."). Both defendants also contend that their sentences of 210 months and 300 months are unreasonable in light of the sentencing factors enumerated in 18 U.S.C. § 3553(a). These sentences reflected the district court's decision to give both defendants the benefit of Booker by sentencing them well below their guidelines ranges of 262 to 327 months and 360 months to life, respectively. The trial testimony showed that both defendants dealt in many kilograms of crack, yet they received sentences that were akin to findings that they had dealt in less than one kilogram of

the drug. Moreover, their sentences were generally consistent with those of their coconspirator defendants who pled guilty and testified against them.

McKoy next argues that the court should have grouped a number of his offenses together because they were consolidated for sentencing. He pled guilty to a number of traffic-related infractions and marijuana possession offenses for which he received concurrent sixty-day sentences. The court treated each as a separate conviction for purposes of McKoy's criminal history. According to United States Sentencing Guidelines section 4A1.2(a)(2), prior sentences in related cases are not to be counted separately. Cases are related if they were consolidated for trial or sentencing, unless the cases are separated by an intervening arrest. USSG § 4A1.2, comment. (n. 3). Although McKoy's cases were consolidated for sentencing, they were all separated by intervening arrests on different dates. Thus, the district court properly scored each as a separate offense under the guidelines.

McKoy lastly argues that the court erred by adding two points to his criminal history under the mistaken view that he was still on probation at the time of the conspiracy offense. Section 4A1.1(d) calls for the addition of two criminal history points "if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." USSG § 4A1.1(d). The charged conspiracy was alleged to have begun on or about October 1, 1998. McKoy was on probation until July 28, 1998 for a number of offenses, but on that date his probation was terminated. According to McKoy, he was incorrectly scored two additional points for being on probation during the instant offense because his probation had been terminated several months before this charged conspiracy.

McKoy's failure to raise this objection in the district court limits our review to plain error.[5]  United States v. Evans, 285 F.3d 664, 674 (8th Cir. 2002).  And as in Evans, McKoy's challenge appears to have "merit but no effect."  Id.  Without these two points, McKoy still had well beyond the thirteen points necessary to qualify him for criminal history category VI.  Thus, we need not conclusively decide whether this assessment was improper.

## CONCLUSION

For the reasons stated above, we affirm the defendants' convictions and sentences.

_____

---

[5]Citing United States v. Paz, 411 F.3d 906 (8th Cir. 2005), the government argues that McKoy's failure to object to this criminal history assessment in the presentence report precludes our consideration of the issue.  That is incorrect.  Paz and similar cases hold that *facts* not objected to in the presentence report are deemed admitted.  Paz, 411 F.3d at 909; cf. Fed. R. Crim. P. 32(i)(3)(A) (permitting a sentencing court to accept undisputed portions of a presentence report as findings of fact).  That has no application here, since McKoy does not challenge the fact that he was on probation until July 28.  Rather, he argues that the undisputed fact that he was discharged from probation on July 28 means that he was not on probation during the conspiracy that was alleged to have started roughly two months later.

-16-