# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2600/08-2109

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| John P. Street, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 22, 2008
Filed: December 1, 2008

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

After a hung jury led to a second trial, John P. Street was convicted of aiding and abetting the intentional killing of Douglas C. Weil in furtherance of a drug trafficking offense. He was then sentenced to life imprisonment without possibility of release. Street appeals, challenging individually and cumulatively five evidentiary rulings of the district court as well as its denial of his motions for a mistrial and for a new trial based on newly discovered evidence. Because irrelevant and prejudicial evidence was introduced in front of the jury affecting Street's substantial rights, we reverse and remand for a new trial.

I.

Street began producing and distributing methamphetamine in 1996 in the Kansas City area. He was indicted for it and pled guilty in 1999 to federal drug and firearm charges for which he was sentenced to 180 months imprisonment. While serving that sentence he was also indicted, twice tried, and ultimately convicted on one count of aiding and abetting the murder of Douglas Weil.

Weil was a friend of Street and had limited involvement in his methamphetamine business. Street's two primary associates in the drug trade were his production assistant, Dale Yeager, and his distributor, Jerry Hilton, but in October 1997 Street asked Weil and John Haidusek to pick up a stolen bulldozer, known as a "skid loader," which he had loaned to a friend. As Weil and Haidusek were returning with the skid loader, they were stopped by police in Blue Springs, Missouri. The officers determined that the skid loader had been stolen and arrested the two men. In their vehicle the police found several trash bags and coolers associated with methamphetamine production and a nine millimeter handgun under Haidusek's seat. It was the government's theory of the case at the murder trials that Street was upset to learn of his colleagues' arrest and feared they might cooperate with the authorities and connect him to the stolen skid loader and methamphetamine production. The government alleged Street was motivated by these concerns to have Weil killed.

Weil's wife, Tammie, last saw her husband on January 19, 1998. Around that time Weil had been driving a 1982 Dodge Aries belonging to Street's father, John Henry Street, with whom Weil had a friendly relationship. When Weil failed to return after several days, Tammie reported him missing. On February 5, 1998, Dale Yeager spotted the Dodge Aries abandoned in the parking lot of a local motel. Yeager notified Street who came to the scene, and the two inspected the car from the outside but did not attempt to enter it. Street telephoned Tammie and asked her to notify the police that her husband's car had been seen in the motel parking lot.

Two police officers responded to Tammie's call. When they arrived at the motel parking lot, they approached the car and examined it from the outside. They were also able to peer into the trunk through an empty speaker socket and saw nothing suspicious. After no one reclaimed the car, police returned to it four days later on February 9. They found it had been moved to a different location in the motel parking lot, and they now were able to see a human foot through the speaker hole. Investigators discovered Weil's body inside the trunk of the car. He had been shot twice and repeatedly stabbed. Street was first questioned about Weil's murder in March 1998 and denied any involvement in it.

Weil's whereabouts and activities between the time of his disappearance and the discovery of his body nearly three weeks later are something of a mystery. His casino card had been used just two days before his body was discovered, and forensic evidence showed he had eaten a full meal and used methamphetamine just hours before his death. Street argues this evidence indicates Weil was living freely and without constraint right up until the moment of his murder and that his extended absence was likely voluntary. Street also suggests that during this time frame, Weil may have been deepening his involvement in a check forging operation with a friend named Charlie Dunne. Shortly before his disappearance, Weil had passed several forged checks at a store where his wife and mother in law worked, causing workplace difficulties for the two women. Dunne was himself questioned by police in April 1998 regarding Weil's murder and invoked his Fifth Amendment right against self incrimination.

Throughout the investigation of Street's drug activities, authorities continued to question him also about Weil's death. He was arrested and charged with methamphetamine and firearm offenses in September 1999 and pled guilty after entering into a plea agreement. Street maintained his innocence of Weil's murder and gave information to the police which he believed inculpated his acquaintance Darren Frank of that crime.

In September 2004, while still serving his 180 month drug and firearm sentence, Street was indicted on three counts related to Weil's murder: (1) aiding and abetting the intentional killing of Weil in furtherance of a drug trafficking offense, in violation of 21 U.S.C. § 848(e)(1)(A), (2) aiding and abetting the intentional killing of Weil while using or carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A), and (3) aiding and abetting the intentional killing of Weil, a potential federal witness, in violation of 18 U.S.C. § 1512(a). The case was tried to a jury in the summer of 2006 and ended with the jury unable to reach a verdict on any of the three counts.

The government then obtained a third superseding indictment which charged the same three murder offenses but included Darren Frank as an additional defendant. Street moved for a severance, and that motion was granted. Frank was tried separately and was convicted of all three murder charges.

At Street's second trial the government was able to produce no physical evidence linking him to Weil's murder. No murder weapon was ever recovered, and Street was excluded as a possible source of the blood and hairs found on Weil's body. The government attempted to connect Street to Weil's murder through the use of cooperating witnesses, including Eva Long and Charlie Dunne. Long testified that Street had become angry upon learning of Weil's arrest and offered to pay Darren Frank $5,000 to kill Weil. Dunne testified that Street had suggested during a conversation that he had killed Weil.

The government also put on four jailhouse informants—Daniel House, Dennis Pospisil, Ronald Harris, and Daniel Jennings. Each of these witnesses claimed that Street had admitted his guilt in separate conversations with them. At one time or another Street had been prison cell mates with House, Pospisil, and Harris. Street denied, however, ever meeting or talking with Jennings. While on the stand Harris also testified that Street had told him he had taken a polygraph test and failed. The

government also introduced into evidence a cache of firearms belonging to Street which had been found sixteen months after Weil's death in the possession of Street's friend Darrell Hein. None of these guns was the murder weapon.

The government also put on a witness with special knowledge of motorcycle gangs, Detective Steve Cook. He testified about the history and organization of American motorcycle gangs in general and specifically about the criminal tendencies of the motorcycle gang "El Forasteros." He also provided specific examples of El Forasteros' violent and lawless behavior. In particular he discussed gang members' degrading attitudes toward women and their brutal hazing rituals. The testimony also indicated that El Forasteros gang members enforced an uncompromising policy against police informants or "snitches."

It is undisputed that Street was never a member of El Forasteros or any other motorcycle gang. Darren Frank had been a former member of El Forasteros, however, and two other gang members had occasionally provided Street with precursor chemicals for his drug operation and purchased the finished methamphetamine. Although the government produced no evidence indicating that Street subscribed to the gang's philosophy and practices, it nevertheless argued during its closing that Street's casual associations with a few El Forasteros members was sufficient for the gang's anti-snitch code "to rub off on [him]."

Street took the stand in his own defense and vigorously denied his involvement in Weil's murder. Street testified to his close friendship with Weil and his distress upon learning of his murder. He put on fifty additional witnesses to testify on his behalf. This stream of witnesses gave evidence used to impeach government witnesses and bolster Street's version of events. Several testified to alternative theories of the crime. Street put on multiple witnesses who said they had heard Darren Frank admit his guilt and justify the murder by claiming Weil had molested children. One witness testified that Frank also admitted stealing a quantity of red

phosphorus (a methamphetamine precursor) from Weil at the time of the murder. Another theory advanced by witnesses was that Charlie Dunne killed Weil, possibly over disagreements arising from their check forging operation, and Street presented a witness who claimed Dunne had admitted his guilt in Weil's death.

The case was submitted to the jury on all three counts of the indictment. The jury acquitted Street of the second and third counts (aiding and abetting the intentional killing of Weil while using or carrying a firearm in relation to a drug trafficking offense; and aiding and abetting the intentional killing of Weil, a potential federal witness), but found him guilty of the first count (aiding and abetting the intentional killing of Weil in furtherance of a drug trafficking offense). At the sentencing phase five jurors indicated they had lingering doubts about Street's guilt and cited that as a factor mitigating against a death sentence, and the jury recommended a sentence of life imprisonment without possibility of release. The district court imposed that sentence in accord with the jury's recommendation.

Street now appeals, arguing the district court committed six errors entitling him to a new trial, either individually or cumulatively. The government responds that there were no errors. Street also seeks a new trial based on newly discovered evidence. The government counters that the new evidence is insufficient to warrant a new trial.

II.

On appeal Street challenges five of the district court's evidentiary rulings, its failure to grant a mistrial, and the denial of his motion for a new trial. He asserts that the district court erred at trial by: (1) excluding evidence of Street's out of court denials of guilt, (2) admitting into evidence the weapons police found in the possession of Darrell Hein, (3) limiting Street's cross examination of government witness Eva Long, (4) limiting Street's cross examination of government witness

Dennis Pospisil, (5) denying Street's motion for mistrial after government witness Ronald Harris testified that Street had told him he failed a polygraph test, and (6) allowing testimony on the general lawlessness of the El Forasteros motorcycle gang. Street also argues that the cumulative effect of these errors cannot be considered harmless. After his original appeal was filed, Street moved in the district court for a new trial based on newly discovered evidence. The district court denied that motion, and Street also appealed from that decision.

Although Street's various objections each require a separate analysis, the basic standard of review is the same for each. We review a district court's evidentiary rulings for abuse of discretion. United States v. Gustafson, 528 F.3d 587, 590 (8th Cir. 2008). "Even when an evidentiary ruling is improper, we will reverse a conviction on this basis only when the ruling affected substantial rights or had more than a slight influence on the verdict." Id. at 591. The district court's denial of Street's motion for mistrial is likewise reviewed for abuse of discretion. United States v. Nelson, 984 F.2d 894, 897 (8th Cir. 1993). Finally, the district court's denial of Street's motion for a new trial based on newly discovered evidence is also reviewed for abuse of discretion, United States v. Horn, 523 F.3d 882, 889 (8th Cir. 2008), but the standard "is rigorous because these motions are disfavored." Id. (internal quotation marks omitted).

III.

In reviewing the issues on appeal we have studied the 2,754 page transcript which covers fourteen days of trial, as well as all the other materials submitted by the parties. For reasons discussed more fully below, we are persuaded that Street is entitled to a new trial. We examine his contentions one by one.

A.  Out of Court Denials of Guilt

At trial Street proposed calling fifteen witnesses who would testify about statements he had made to them about Weil's death and his innocence of the crime. The district court excluded the evidence as hearsay, but Street argues that the evidence would have served the nonhearsay purpose of demonstrating that the details of Weil's murder had been widely discussed.  Street is correct that such statements would not be hearsay if they were not offered to prove the matters asserted.  See Fed. R. Evid. 801(c).  He claims they were offered only to demonstrate that the government witnesses could have learned details of the murder from the prison grapevine and then fabricated convincing accounts of Street's alleged confessions to it.  The evidence offered by Street included more, however, for it included statements he had made to witnesses that he was not guilty of Weil's murder.  He asserts that this evidence was necessary to provide context for his statements about details of the crime.

The trial record reflected that Street acknowledged having talked with three of the four jailhouse informants who testified for the government, and Street's associate Jerry Hilton testified that he himself had provided details of the crime to the fourth informant.  There was thus already considerable evidence introduced at trial establishing how the informants could have learned about details of Weil's death. Calling another fifteen witnesses to reinforce this point would have been of little probative value,  unnecessarily cumulative, and possibly confusing to the jury.  See Fed. R. Evid. 403.  Under these circumstances the district court did not abuse its discretion in disallowing Street's additional witnesses.

B.  Weapons Evidence

Street also challenges the admission of a large number of weapons which had belonged to him but were recovered by the police from the home of Darrell Hein sixteen months after Weil's death.  Tests showed that none of these guns was the

murder weapon.  Street argues that evidence of these guns was irrelevant and highly prejudicial.  The government responds that the firearms were properly admitted as tools of the drug trade tending to establish the elements relevant to drug trafficking. While it is true that an irrelevant firearm might unfairly suggest to jurors that a defendant has a violent disposition, see Walker v. United States, 490 F.2d 683, 684-85 (8th Cir. 1974), this evidence was relevant to two of the three counts Street faced at trial.  Firearms are routinely allowed into evidence as "tools of the trade" in drug trafficking cases.  See, e.g., United States v. Dierling, 131 F.3d 722, 732 (8th Cir. 1997); United States v. Emmanuel, 112 F.3d 977, 979 (8th Cir. 1997).

Street distinguishes the cases cited by the government by arguing that since these weapons were discovered well after the fact and in the possession of Hein, they were not obviously connected to his own drug operation by either time or location. The weapons were not found in close proximity with contraband drugs and paraphernalia as was the case in Emmanuel.  112 F.3d at 979.  Here there is no dispute as to the ownership of the guns.  Since the weapons admittedly belonged to Street, they might still be relevant even though discovered at a time and place remote from him and his methamphetamine operation.  A jury might draw the reasonable inference that the guns were acquired for the purpose of protecting or funding Street's drug activities and were later entrusted to Hein in order to conceal them.

Moreover, even if we were to accept that the district court erred in admitting the weapons cache, we would conclude that any such error was harmless:  "[i]mproper admission of evidence which is cumulative of matters shown by admissible evidence is harmless error."  United States v. Triplett, 104 F.3d 1074, 1079 (8th Cir. 1997) (internal quotation markes omitted).  Here the effect on the jury of admitting the guns recovered from Hein's possession was not obviously different from the effect of admitting—as the district court did without objection—other weapons seized directly from Street's residence or person.

We therefore conclude that the district court did not abuse its discretion by allowing the disputed weapons cache into evidence and that any error would have been harmless.

C.  Cross Examination of Eva Long

Street further objects to limitations imposed on his cross examination of government witness Eva Long.  Long testified at trial that she was present when Street sent Weil and Haidusek to retrieve the skid loader and that she later observed Street's angry reaction to the news that the two of them had been arrested.  Long also claimed that at some point she heard Street offer Darren Frank $5,000 to kill Weil.

Long was herself arrested in a separate incident in which she led several law enforcement officers on a high speed chase over several hours.  She acknowledges that in the course of that chase she told her teenaged companion to shoot at the pursuing officers.  Although the district court allowed evidence of the high speed chase, it excluded testimony regarding Long's instruction to shoot at the officers.  Street argues that evidence of Long's willingness to open fire on law enforcement agents was relevant to show the lengths to which she would go to avoid incarceration and her willingness to implicate Street in order to win leniency in her own case.

While "[t]he Sixth Amendment guarantees a defendant an opportunity for effective cross-examination of witnesses," courts retain wide latitude to impose reasonable restrictions on such confrontations.  United States v. Love, 329 F.3d 981, 984 (8th Cir. 2003)  A violation occurs only "when a defendant demonstrates that a reasonable jury might have received a significantly different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination."  Id. (emphasis added).  At trial Street had adequate opportunity to impeach Long, and he did so.  He pointed out inconsistencies within her various accounts and between her testimony and police records.  Long acknowledged her own extensive criminal history and her hope for a sentence reduction in exchange for her

testimony against Street. Two witnesses testified for Street that Long had admitted her willingness to do "anything" to avoid prison.

Evidence that Long instructed her companion to shoot at pursuing police officers would tend to show her willingness to engage in illegal or reckless behavior to advance her own interests and was relevant on the issue of whether she would have hesitated to falsify her testimony had she believed it would curry favor with prosecutors. It is not clear that any potential prejudice from introducing this evidence on cross examination would have outweighed its relevance. But even if the district court had abused its discretion in disallowing Street's proposed line of questioning, the error would have been harmless. It is unlikely the district court's exclusion had a significant effect on the jury's assessment of Long's credibility since Street introduced other evidence to show her eagerness to reduce her sentence and otherwise impeached her credibility. We conclude that the district court did not abuse its discretion in limiting Street's cross examination of Long and that any such abuse would have been harmless error.

## D. Cross Examination of Dennis Pospisil

Street raises a similar objection regarding the cross examination of government witness Dennis Pospisil, one of the four jailhouse informers who claim to have heard Street confess his guilt in Weil's murder. Street vigorously attempted to impeach Pospisil, introducing evidence of Pospisil's lengthy criminal history and the sentence reduction he received in return for his testimony against Street. He also called Casey McElroy to testify that he had been Pospisil's cell mate and heard Pospisil admit that he was making false accusations against Street in return for a reduced sentence. When Street sought to pursue the contention that Pospisil had perjured himself during his own unrelated trial for ethnic intimidation, however, the district court did not allow inquiry into the alleged perjury.

Street argues on appeal that he should have been permitted to pursue this line of impeachment. He asserts that since Pospisil took the stand at his own trial and maintained his innocence, the jury's finding of guilt indicates that his testimony must have been false. As the district court correctly noted, however, Pospisil's conviction does not establish that any particular part of his testimony was untrue. While a witness may be impeached by inquiring into his prior convictions, see Fed. R. Evid. 609, "the scope of such examination is strictly limited in order to avoid the confusion resulting from the trial of collateral issues, and also to avoid unfairness to the witness." United States v. Roenigk, 810 F.2d 809, 814 (8th Cir. 1987). Street was allowed to question Pospisil regarding his prior convictions and was able to demonstrate that Pospisil was convicted following a jury trial. To inquire further and to contest the truthfulness of Pospisil's individual past statements would be to relitigate his prior conviction. That is precisely the sort of confusing, collateral issue warned against by Roenigk. The district court did not abuse its discretion in disallowing this line of impeachment.

E.  Street's Polygraph Test

On direct examination Ronald Harris, another of the government's four jailhouse informants, was asked by the prosecutor if Street had discussed Weil's murder on more than one occasion. Harris replied: "Yes. First he said they are trying to pin a murder on him and we talked about it, about a friend of his that had died or was murdered, and he said that, he said that he took a polygraph test and failed that." Street's attorney immediately moved for a mistrial. The court denied the motion and instead instructed the jury that "polygraph examinations are not scientifically reliable and they're not admissible in evidence."

Neither party argues that polygraph evidence is admissible or that the government was entitled to introduce Harris's testimony that Street had told him he had failed a lie detector test about Weil's murder. The issues are whether the district

court's curative instruction was sufficient to repair any damage done to Street's credibility by his reported admission to have failed a polygraph test and whether the district court should have granted his motion for mistrial. Street argues that whenever a defendant himself testifies and his credibility is critical to the outcome of the case, a jury instruction is never sufficient to cure even the slightest reference by a witness to a defendant's negative polygraph results. In such cases Street urges a rule of automatic mistrial. We have never announced such an inflexible rule, and we decline to do so today.

After examining the particular circumstances of this case, however, we conclude the district court should have declared a mistrial following Harris's statement that Street had admitted to him that he had failed a polygraph. Clearly Street's credibility was vital to his defense. We held in United States v. St. Clair, 855 F.2d 518 (8th Cir. 1988), that "'[t]o determine whether a curative instruction or a mistrial is the proper response to a polygraph, the court must consider whether an inference about the result of the test may be critical in assessing the witness' credibility and whether the witness' credibility is vital to the case.'" Id. at 523 (quoting United States v. Brevard, 739 F.2d 180, 182 (4th Cir. 1984)). Street testified on his own behalf. The government had essentially no physical evidence linking him to Weil's death, and the case was a "swearing match" between Street and the government witnesses. The only remaining question under St. Clair is whether revelation of the polygraph result was "critical in assessing [Street's] credibility."

In this case the jury was informed not just that Street had declined to take a test, but that he had taken one and failed. We held in St. Clair that a law enforcement officer's single mention of the defendant's refusal to submit to a polygraph examination could not have been cured by a jury instruction. The prejudice to Street is surely greater because of the claim that Street also said he had failed the test. Of added significance is that Harris testified at both of Street's trials, but only brought up the lie detector test in the second. At the first trial prosecutors instructed Harris not

to mention Street's polygraph test, and he complied. That trial ended in a hung jury on the murder charges. The government acknowledges that at the second trial it neglected to renew its instruction or to remind Harris about it. Furthermore, Harris was unavailable to testify during the prosecution's case and the defense agreed that its own case could be interrupted when he became available. It turned out that Harris was not available until the middle of Street's case, and the government was permitted to interrupt the defense case to call Harris out of turn. He then gave the unanticipated polygraph testimony, and the evidence that Street had taken and failed a lie detector test was thus fresh in the jury's mind when Street took the stand.

The government claims that the polygraph reference was brief, unsolicited, and overshadowed by the balance of Harris's testimony concerning Street's alleged confession to the crime. It also points out that the district court's admonition to the jury included an explanation that such tests are scientifically unreliable. Ordinarily such an instruction might suffice to cure a prejudicial statement. United States v. Nelson, 984 F.2d 894, 897 (8th Cir. 1993). In making such a determination the court, however, must evaluate "whether a curative instruction was sufficient in the context of the entire trial, and weigh the prejudice against the strength of the government's evidence." United States v. Urick, 431 F.3d 300, 304 (8th Cir. 2005).

Where there is "substantial evidence" of guilt a conviction may stand despite the prejudicial testimony, id., but this case was close. The government had no physical evidence directly linking Street to Weil's murder. Instead its case was largely built on the testimony of cooperating witnesses and jailhouse informants. The first jury was unable to reach a verdict on any of the three counts against Street. The second jury convicted him only on the count of aiding and abetting Weil's murder in furtherance of a drug trafficking offense. It acquitted him of the related charges of aiding and abetting Weil's murder while carrying a gun in furtherance of a drug trafficking offense and aiding and abetting the murder of a potential federal witness.

-14-

Moreover, at the penalty phase five jurors professed lingering doubts about Street's guilt even as to the charge of conviction.

After carefully considering the record, we conclude that the relevant factors weigh in Street's favor as to whether the curative instruction was sufficient to overcome the potential prejudice of the polygraph evidence. The polygraph reference related to the testifying defendant himself, supposedly involved an admission, clearly indicated he had failed the exam, and came in the midst of the defendant's case at a peculiarly damaging point to him. We therefore conclude that the district court abused its discretion when it denied Street's motion for mistrial following the introduction of the polygraph evidence. "An error is harmless if it does not affect substantial rights of the defendant, and did not influence or had only a slight influence on the verdict." United States v. Hogan, 539 F.3d 916, 922 (8th Cir. 2008) (internal quotation marks omitted). Given the closeness of the case, its novel facts, and the vital importance of Street's credibility to his defense, we cannot conclude that refusal to grant a mistrial in light of the polygraph testimony was harmless.

F.  The El Forasteros Evidence

In its case in chief the government called Detective Steve Cook of the Independence, Missouri police department. Cook had participated in the investigation of Street's drug making operation, but the government acknowledged in its closing argument that the "main purpose of [his] testimony" was not about Street's drug business, but to illustrate the violent, lawless propensities of outlaw motorcycle gangs. Half of Cook's testimony, spanning twenty pages in the record, is devoted to an alarming portrayal of gang culture in general and of the local El Forasteros gang in particular.

Street sought repeatedly to exclude the motorcycle gang evidence, beginning with a motion in limine prior to his original trial. During the second trial, Street maintained

-15-

an ongoing objection to the gang evidence. Following his conviction, Street moved the district court for a new trial based in part on the gang testimony. The district court denied the motion.

Cook testified that he had received approximately one thousand hours of training on "outlaw motorcycle gangs." He began his gang testimony by recounting a 1947 riot in California which evidently spawned the outlaw biker movement. Gang members self consciously adopt an "outlaw lifestyle," he testified, and refer to themselves as "One Percenters" to distinguish themselves from the bulk of law abiding motorcycle enthusiasts.

> They want to be different. They want to dress different. They don't want to associate with normal people and don't want to follow the rules that normal citizens follow on a day-to-day basis, they want to do their own thing regardless of the effect it has towards them or what the law says.

Cook then identified El Forasteros as an outlaw gang operating in the Kansas City metropolitan area.

Cook told jurors that El Forasteros was affiliated with another local gang known as Galloping Goose, as well as with the national Hells Angels club. The allied gangs, he said, would support each other when disputes turned violent. "If there is any kind of an incident, a shoot-out, a large scale fight, brothers back brothers." Cook further emphasized the violent nature of the gangs by distinguishing them from other fraternal societies. "[I]f the Kiwanis, the Lions Club have a disagreement they will sit and talk about it. The Banditos and the Hells Angels will blow each other's vehicles up, shoot, assault. That's how they resolve issues within the biker community." Cook explained that bikers were territorial and would resort to violence to protect their turf, offering as an example a shooting in a Las Vegas casino. The gangs, he said, also modified or "chopped" stolen motorcycles to conceal their illegal origins.

Cook described the elaborate three part vest patches used to identify gang loyalties and demarcate territory. These include "One Percenter" designations and tattoos: "sometimes on the throat is a pretty popular location and painful." New El Forasteros members, Cook testified, underwent a "very degrading" hazing process in which prospects might be forced to clean up self induced vomit of full members and in which the mettle of initiates is tested by random beatings. Women, according to Cook, were never permitted to join the gang. "Women are property. They are property to the gang. They have no status in the gang, [t]hey are looked down upon. They are considered they're disposable. If one of them goes to jail, takes a fall, they replace them and they are expected to keep quiet."[1]

All gang associates are expected to keep quiet according to Cook, who described a violent and uncompromising gang policy against "snitches" who cooperate with law enforcement authorities. "They have a term for snitches, Snitches are a Dieing [sic] Breed." To underscore this gangland ethos, the government introduced into evidence—over specific objection by the defense—a photograph of a t shirt which Cook identified as similar to those sold by El Forasteros at motorcycle shows. The shirt depicts "a coffin with a skull and cross bones in it with blood dripping from it. Says K.C. for Kansas City and says Snitches Get Stitches for Being Punk Bitches." Although there was no evidence linking this t shirt to Street or to any of his associates, Cook was allowed to testify that the shirt was "an advertisement for violence." The jury was further told that "with the blood dripping from it you can tell that there is damage to the head of the skull. It's showing what can happen, showing what could happen to a snitch or what they believe should happen to a snitch."

The net effect of Cook's testimony was to locate El Forasteros within a tradition of misogynistic, hardened outlaws, but the relevance of this testimony was not

---

[1]It appears from the record that seven or eight of the twelve jurors for Street's second trial were women. (In the polling of the jury by the district court, it addressed seven jurors as "Miss," four of them as "Mr.," and one as "Mr. . . . Miss.")

established.  Cook testified to incidents of violence  from as long ago as 1947 and from as far afield as Las Vegas, Nevada, and Hollister, California.  He described arcane insignia and painful tattoos intended to set gang members apart from the rest of civilized society.  He recounted nauseous and brutal initiation procedures.  He made repeated references to shootings, assaults, and theft.  He explained the general contempt gang members displayed towards women.  None of this was tied to the actual crimes with which Street was charged or the particular facts of his case.

On appeal the government argues that the gang's attitude toward police informants was relevant to the prosecution theory that Street was motivated to eliminate Weil after he was arrested with the skid loader in order to prevent Weil from giving damaging information about Street to the police.  The government acknowledges, however, that Street was not, nor ever had been, a member of El Forasteros nor had he ever set foot in the gang's headquarters.  Without specific factual grounding the prosecutor nevertheless claimed in his closing argument that the gang's lifestyle had "started to rub off on [Street]."

While Cook testified that in his opinion Street was "an associate, hang-around" of full gang members, the evidence indicates that only two gang members—Dennis Cooper and Robert Peters—had any connection to Street.  Cooper and Peters had occasionally worked on motorcycles with Street, supplied him with precursor chemicals for his drug manufacturing, and purchased and used the finished product.  Their drug transactions were often conducted through Jerry Hilton, Street's distributor, rather than through Street himself.

Hilton testified for the defense that these two gang members were not integrated participants in Street's drug operation and that they were actually disfavored customers because they often declined to pay.  There is no evidence that Street ever was a member of a gang or sought membership in one.  There is no evidence that any gang was itself involved in Street's activities or that he desired such involvement.

There is no evidence that Street's relationship with Cooper and Peters was in any way based on their gang affiliation or that he was privy to the El Forasteros code.

One of Street's acquaintances, Darren Frank, was a former member of El Forasteros. Frank had a reputation for violence and bullying, and he accompanied Street on one occasion when he went looking for someone to settle a dispute. Street acknowledged that in this instance Frank forcibly wrestled an individual down onto a desk. Street denied any other close association with Frank or that he employed Frank as an enforcer or debt collector. As previously noted, Frank was himself charged with murdering Weil and separately convicted on all counts. The government's gang expert acknowledged that Frank was a freelancer whose illegal activities extended well beyond his gang ties. From the available evidence it would appear that Street's relationship with Frank was unrelated to the latter's former membership in El Forasteros.

Over Street's objection this government witness was allowed to provide extensive, prejudicial testimony concerning the violent tendencies and criminal dispositions of gangs in general and of the Kansas City El Forasteros in particular. The witness testified about a number of irrelevant but highly disturbing aspects of gang culture, including attitudes toward women, brutal hazing practices, outlaw tattoos and markings, and trafficking in stolen motorcycles. None of this was relevant to Street or the charged offenses. The government also introduced evidence of El Forasteros' hostility towards snitches, evidence which included a lurid t shirt with no discernible connection to Street. Based on nothing more than some association with several men who were current or former gang members, the prosecution introduced considerable evidence tending to link Street to gangland culture.

We have previously held that allowing such motorcycle gang evidence is reversible error. In United States v. Roark, 924 F.2d 1426 (8th Cir. 1991), the defendant, a member of the Hells Angels motorcycle gang, was charged with various

drug offenses. Despite his membership it was error for the trial court to have allowed testimony regarding the gang's "institutional criminality" and involvement in drug manufacturing and distribution. Id. at 1434. Thus, even in that situation where a member of a gang allegedly engaged in conduct which conformed to the gang's reputation, it was inappropriate to expose the jury to such evidence because it would be "inherently and unfairly prejudicial" and would "deflect[] the jury's attention from the immediate charges and cause[] it to prejudge a person with a disreputable past, thereby denying that person a fair opportunity to defend against the offense that is charged." Id. In the present case most of the gang reputation evidence had no discernible connection to the murder charges Street faced, and Street was not a gang member nor ever had been.

The government argues that there is no blanket rule disallowing evidence of gang affiliation. While that is true, the cases it cites do little to support the admissibility of Cook's extensive testimony about outlaw gangs. First, each of the government's cases concerns a defendant's own gang membership. In this case Street was not nor ever had been a gang member. Second, most of the government's cases concern the mere fact of a defendant's gang membership. They did not sanction a wide ranging inquiry into the generic criminality and violent dispositions of gangs and their members. Third, when mention of gang membership is allowed it is generally an unavoidable incident of presenting other permissible evidence. For example, when a gang membership ring was discovered alongside other incriminating evidence, the defendant's gang affiliation was admissible because it connected him to the ring and, through it, to other evidence. United States v. Lemon, 239 F.3d 968, 971-72 (8th Cir. 2001).

Likewise, a passing reference to gang membership has been upheld where it was relevant to explain police investigatory tactics. United States v. McKay, 431 F.3d 1085, 1093 (8th Cir. 2005). The McKay court emphasized that even such limited gang related testimony required an instruction to prevent jurors from drawing

-20-

improper inferences: "gang affiliation evidence is not admissible where it is meant merely to prejudice the defendant or prove his guilt by association with unsavory characters." Id. In three other cases, evidence of gang membership was allowed because it was relevant to establish conspiracy or to rebut codefendants' innocent explanations of their relationships with one another. United States v. Bradford, 246 F.3d 1107, 1117 (8th Cir. 2001), overruled on other grounds by United States v. Diaz, 296 F.3d 680 (8th Cir. 2002); United States v. Johnson, 28 F.3d 1487, 1497-98 (8th Cir. 1994); United States v. Sparks, 949 F.2d 1023, 1026 (8th Cir. 1991). In none of these cases was gang membership used to show criminal propensity or otherwise paint a defendant guilty through mere association.

The government also relies on an Eleventh Circuit case, United States v. Mills, 704 F.2d 1553, 1559 (11th Cir. 1983), in which a defendant's membership in the Aryan Brotherhood was held admissible in order to establish his motive to avenge a slight against a fellow member. The Mills court also allowed evidence on the internal workings of the Brotherhood to show how members could communicate with each other despite being incarcerated in different facilities. Id. The gang evidence there was admissible because it was an "integral and natural" part of the crime. Id. That is not the situation here, where there was no evidence to show that Street's informal relationship with a few El Forasteros members was related to the Weil homicide.

The government makes much of a police report about an investigator's interview with Chris Hunt, one of Street's associates. According to the report, Hunt acknowledged that following Weil's arrest with the skid loader, Hunt and Street had discussed whether Weil could "hold his mud," that is, maintain his silence. The phrase "hold his mud" is evidently a gang expression, and the government argues Hunt's use of the phrase shows the influence of gang attitudes on Street. Hunt testified, however, that he never used that phrase in his discussions with investigators. Moreover, even if the police report is accurate in that detail, it would at most establish that the phrase was used during the police interview. It would not show that Hunt ever

-21-

used the phrase in his conversations with Street, much less that Street himself ever used the phrase.

We conclude that Cook's testimony about outlaw motorcycle gangs and El Forasteros was excessive, unduly prejudicial, and in great part completely irrelevant to the charged offenses. The district court thus abused its discretion in allowing this evidence. Moreover, we cannot conclude that the error was harmless. This was a close case. The government had little if any physical evidence tying Street to Weil's death. His first trial ended in a hung jury; the second trial ended in acquittal on two of three counts; and in the penalty phase five jurors revealed lingering doubts as to the one count on which Street was convicted. Given this record we cannot conclude that the admission of evidence on gang culture and attitudes was harmless error.

Although considerable deference is due the district court under an abuse of discretion standard and even an improper evidentiary ruling will be viewed as harmless unless it "affected substantial rights or had more than a slight influence on the verdict," United States v. Gustafson, 528 F.3d 587, 591 (8th Cir. 2008), we conclude that the impermissible El Forasteros evidence and the evidence that Street admitted he had failed a polygraph were sufficient to warrant a new trial for the defendant. Even if one were to question the ability of either error, in isolation, to "influence . . . the verdict," given the closeness of the trial "the cumulative effect of these errors cannot be considered harmless and could easily have been the difference between conviction and acquittal." United States v. Bledsoe, 531 F.2d 888, 892 (8th Cir. 1976).

IV.

The final issue on Street's appeal relates to his motion for a new trial. In February 2008, more than a year after his conviction, Street obtained an affidavit from Lynn Schmitz in which he alleged that government witness Dennis Pospisil had admitted

to Schmitz that he had fabricated his trial testimony against Street. Based on the Schmitz affidavit, Street sought an evidentiary hearing on the matter and a new trial. The district court denied the motion. Since other impeachment evidence had been introduced at trial regarding Pospisil's credibility, the district court did not abuse its discretion at the time it denied the motion. See United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001) (holding that new evidence must be "more than merely cumulative or impeaching" in order to support a new trial).[2]

## V.

For the foregoing reasons we conclude that it was an abuse of discretion to deny Street's motion for a mistrial following testimony by a government witness that Street had admitted failing a polygraph examination and it was reversible error to allow such extensive testimony on the violent, lawless tendencies of the El Forasteros motorcycle gang. Given the closeness of this case we conclude that neither error alone—and certainly not the two in combination—can be considered harmless. We therefore reverse the judgment of the district court and remand for further proceedings.

_____

---

[2]Whether Schmitz's testimony would be admissible at any future trial is not an issue requiring consideration at this time.